# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MERCER ISLAND SCHOOL DISTRICT,

    Respondent,

v.

OFFICE OF THE SUPERINTENDENT OF PUBLIC INSTRUCTION, a state agency,

    Defendant,

N.W. and R.W., on behalf of B.W., a minor child,

    Appellants.

DIVISION ONE

No. 71419-8-I

PUBLISHED OPINION

FILED: April 13, 2015

DWYER, J. — In 2010, our legislature passed a law prohibiting racial discrimination in Washington public schools. In doing so, the legislature directed the Office of Superintendent of Public Instruction (OSPI) to enforce and obtain compliance with its nondiscrimination mandate. Subsequently, in May 2011, the OSPI engaged in formal rulemaking pursuant to this directive. As part of this, the OSPI authorized an administrative enforcement procedure and indicated that compliance with relevant federal civil rights law would constitute compliance with the legislature's nondiscrimination mandate. Shortly thereafter, in February 2012, the OSPI articulated a specific compliance standard without reference to

federal law. Our task is to determine the proper compliance standard in administrative enforcement proceedings in this interim period.

This task is set against the backdrop of an administrative enforcement proceeding against the Mercer Island School District, initiated as a result of its allegedly improper response to several incidents of student-on-student peer racial harassment. Following an administrative hearing, the OSPI—through its designee administrative law judge—concluded that the District had displayed "deliberate indifference" to the incidents of racial harassment and had, thereby, failed to comply with the legislature's 2010 nondiscrimination mandate. The District filed an administrative appeal in King County Superior Court, which resulted in reversal of the OSPI's decision. We now reverse the superior court and reinstate the OSPI's decision.

I

During the 2011-12 school year, B.W. was subjected, on two occasions, to peer racial harassment.[1] At the time, B.W. was in seventh grade at Islander Middle School—a public school within the Mercer Island School District (the District). It was B.W.'s first year attending school in the District. His parents, N.W. and R.W. (collectively Parents), had relocated their family to Mercer Island from out of state. B.W.'s father, N.W., is white; B.W.'s mother, R.W., is black.

B.W. had been diagnosed with Asperger's syndrome and Attention Deficit Hyperactivity Disorder. Because of these diagnoses, B.W. had, in his previous

---

[1] Our factual account is based, almost exclusively, on the thorough and comprehensive factual findings entered by Michelle Mentzer, the administrative law judge who presided over the administrative hearing in this matter.

school district, participated in an individualized education program. However, after a one week trial period with a similar program in the District, the Parents chose to discontinue B.W.'s participation. They did so because the program offered by the District required B.W. to leave the general education classroom in order to participate.

The two incidents of racial harassment took place in October 2011. Both occurred in B.W.'s social studies class, which was taught by Jan Brousseau.

The first incident occurred on October 5. On that day, B.W. was working on a group project—referred to as "Rock Around Washington"—with three other boys—Students A, B, and C. Student A was "saying cruel things" directly to B.W. and was whispering "in hushed tones to [Student B]." When B.W. "offered an idea about the project," Student A told him, "Shut up, you stupid Black."

Once class had ended, B.W., who was in tears, told Brousseau that "[Student A] was being mean." Brousseau "said that she would handle it." Brousseau had noted a great deal of conflict in the group, including between B.W. and Student A. In fact, she considered it to be the most dysfunctional group she had ever educated. Brousseau placed most of the blame for the conflict on B.W.

Later that day, B.W. and Student A were seen by a teacher, Brody LaRock, throwing crab apples at one another while waiting for the school bus. B.W. told LaRock that he had thrown the crab apple because Student A had not listened to his ideas in class that day. LaRock directed the boys to report to his office the following day. Student A filled out an incident report and was

disciplined with a one-day in-school suspension. B.W., however, was out of town with his family, and so LaRock referred the matter to Mary Jo Budzius, a co-principal, for further action.

On October 10, B.W. told his Parents that Student A had told him, "Shut up, you stupid Black." The Parents had previously scheduled a meeting with Brousseau and Budzius for October 11; yet, upon hearing what Student A had said to B.W., R.W. e-mailed both Brousseau and Budzius to inform them that she had an additional issue to discuss with them. At the October 11 meeting, the Parents told Brousseau and Budzius what Student A had said to their son.

Although Budzius believed that B.W. had heard the word "Black," she did "not know whether he heard it with his ears, or only in his own mind." Despite her skepticism, Budzius spoke with Student A the day after meeting with the Parents. Student A admitted calling B.W. "stupid" but denied calling him "stupid Black." Budzius talked to Student A about not using race as the basis for angry comments and had him sign an "anti-harassment contract." Budzius also distributed a behavior contract to Student A's teachers concerning inappropriate interactions with his peers.

Budzius decided not to question Students B or C.[2] She made this decision for several reasons. First, she "reasoned [that Student A] would not lie about calling [B.W.] 'stupid Black'" because Student A had already admitted to calling B.W. "stupid." Second, she believed that, owing to Asperger's syndrome,

_____

[2] By choosing not to question Students B and C, Budzius failed to meet the District's minimum investigative requirements.

- 4 -

B.W. struggled to read social cues. In fact, Budzius believed that the source of conflict between B.W. and Student A was attributable to B.W.'s social deficits.

Like B.W., Student A was new to the District. In his brief time in the District, Student A had, on multiple occasions, engaged in disruptive behavior. In fact, when District staff contacted Student A's mother concerning the crab apple incident, it was the third time in that week alone that she had been contacted regarding her son's behavioral issues. Indeed, his behavior had been sufficiently troubling that he was the subject, on October 12, of a Building Guidance Team meeting—a group composed of various educators, administrators, and mental health professionals that meets to plan support for students in need of support, whether academic or otherwise. Notably, the meeting was unrelated to the allegation of racial harassment.

The second incident took place on October 25. On that day, the class was studying ethnic diversity and tolerance. B.W.'s group was discussing "people from Mexico," Mexican culture, and Mexican food. "[Student A] again began saying cruel and derisive things to [B.W.]." B.W. ignored Student A's remarks until Student A said that B.W. "crossed the border from Mexico" and Student B said that B.W. was "'exported' from Mexico." B.W. responded by asking Student B, "'Why don't you make me a croissant for 25 cents, you French jackass?'" Student B is of French heritage.

Following class, LaRock noticed B.W. crying in the lunch room. LaRock invited B.W. to talk in LaRock's office. After being told by B.W. what had happened, LaRock had B.W. fill out an incident report. LaRock then asked

building administrators to address the matter.

Aaron Miller,[3] a co-principal, investigated the second incident on the day it occurred. He conducted brief interviews of all five students, including B.W., who had been in the same small group. Each interview lasted around 10 minutes. While none of the other four students mentioned the remarks made by Students A and B to B.W., all four said that they heard B.W.'s remark to Student B. Nearly two months later, Student A revealed that the group had been discussing "people from Mexico," Mexican culture, and Mexican food. However, he did not disclose that information to Mr. Miller. When Mr. Miller finished these interviews, he e-mailed the Parents to inform them of the incident and his investigation.

R.W. responded to Mr. Miller's message the following day. She reminded Mr. Miller that this incident was the second time that Student A had targeted her son on the basis of race. She also asked to file a formal complaint.

In response to R.W.'s request to file a formal complaint, Mr. Miller sent her a "Harassment/Bullying Report Form." This form, which was no longer used by the District, directed the complainant to select either an "informal" complaint, which would be investigated by Islander Middle School, or a "formal" complaint, which called for an investigation by the District. Yet, Mr. Miller was already conducting an informal investigation.

On October 27, Budzius wrote to all of B.W.'s teachers, inquiring whether they had experienced problems with B.W.'s behavior in their classrooms. Two of

---

[3] We refer herein to Aaron Miller as Mr. Miller and Rachel Miller (an attorney retained by the District) as Ms. Miller, in an effort to avoid the confusion that would follow from referring to them only by their common surname.

B.W.'s teachers responded to say that, while B.W. did have some behavioral issues, they did not raise significant concerns. Budzius did not similarly inquire about Student A's behavior. This was in spite of the fact that, in his first two months in the District, Student A had displayed significant behavioral problems on multiple occasions, which prompted District staff to respond by holding a Building Guidance Team meeting. As previously noted, Budzius believed that the source of conflict between B.W. and Student A was attributable to B.W.'s social deficits.

Also on October 27, Budzius asked Harry Brown, a counselor, to provide assistance to B.W. with social skills. However, Budzius did not ask Brown to provide counseling to B.W. regarding the incidents of racial harassment or a disturbing essay, written by B.W., that she had received two days earlier. Brown contacted R.W. for the purpose of inviting B.W. to join "Boys' Council"—a program for students in need of assistance developing social skills. Brown did not share with the Parents the reason for the invitation. Subsequently, the Parents asked Brown not to have further contact with B.W. because he had not been forthcoming with regard to his reasons for inviting B.W. to participate in "Boys' Council."

Between October 25 and 28, District Superintendent Dr. Gary Plano made his monthly site visit to Islander Middle School. The focus of this particular visit was B.W. During his visit, Plano observed B.W. in order to assess his interactions with others. Plano did not, however, observe Student A. Plano also did not observe the class in which both alleged incidents had taken place.

Following his observation of B.W., Plano asked the District's director of special education to prepare a letter for him concerning B.W.'s initial special education status in the District and the Parents' subsequent withdrawal of consent for special education.

On October 31, Mr. Miller sent a report of his investigation to the Parents. Although he did not find support for B.W.'s allegations, he nonetheless outlined a series of "Next Steps" that the school would take in order to prevent future discrimination: (1) a paraeducator would be placed in Brousseau's class; (2) Brousseau and Brown would develop a curriculum on diversity and multiculturalism for Brousseau's class; (3) the school would begin its annual anti-bullying and anti-harassment program for all students in November 2011;[4] (4) the school administration would contact all parents and work with families to clarify its expectations with regard to appropriate interactions between students; and (5) Brown would work with B.W. and Student A individually.[5] Mr. Miller e-mailed his report to the Parents and attached the obsolete "Harassment/Bullying Report Form" that he had previously sent to R.W. on October 26.[6]

Omitted from Mr. Miller's report was any mention of a troubling sequence of events. On October 25, B.W. had submitted an essay (hereinafter Moment Essay) for the "Rock Around Washington" project. Therein, B.W. described a

---

[4] This presentation did not occur until the end of February 2012. The focus of the presentation was harassment based on sexual orientation.

[5] Brown, as previously noted, contacted B.W.'s Parents on October 27. There is no evidence that Brown worked with Student A.

[6] By failing to consider the two incidents together, Mr. Miller failed to meet the District's minimum investigative requirements.

violent accident occurring to Student A: "[Student A] was ranting at me as usual, then, a Fed Ex truck squealed into the driveway and hit [Student A] just as he turned around." As a result of the accident, B.W. wrote that Student A "'would be mentally challenged for the rest of his short life.'" B.W. concluded the essay by saying, "Today was the best day of my life."

When Brousseau received the Moment Essay, she immediately shared it with Budzius, who then shared it with Mr. Miller. However, none of them informed the Parents of the essay's disquieting contents; nor did they discuss it with B.W. Instead, Brousseau returned the Moment Essay to B.W. with the following notation: "THE CONTENT OF THIS PAPER IS NOT IN KEEPING W/ THE NATURE OF THIS PROJECT WHERE BAND MEMBERS ARE TO RESPECT, SUPPORT & ENCOURAGE OTHER BAND MEMBERS[.]"[7]

Subsequently, on November 7, Brousseau corrected another "Rock Around Washington" essay (hereinafter Kennewick Essay) submitted by B.W. Although Brousseau corrected the Moment Essay before the Kennewick Essay, B.W. had, in fact, submitted the Kennewick Essay prior to the Moment Essay. In the earlier Kennewick Essay, B.W. described a violent accident occurring to Student A, which left him hospitalized for 24 hours. The nature of the accident in both essays was quite similar, though the consequences were more severe in the second essay. Rather than informing the Parents of the Kennewick Essay's disturbing contents or speaking with B.W., Brousseau gave the essay 8 out of 20

_____

[7] The ALJ noted that "Brousseau often writes in all capital letters when correcting papers."

possible points for failing to include many of the required elements for the assignment. Although Brousseau e-mailed the Parents on November 7 and asked them to encourage B.W. to rewrite the Kennewick Essay, she still did not provide them with a copy of the essay or inform them that it had included a discussion of a violent accident involving Student A, who had allegedly targeted B.W. twice on the basis of race.

On November 15, the Parents met with Brousseau and the co-principals regarding the incidents of racial harassment and B.W.'s progress in Brousseau's class. At that meeting, Brousseau insisted that the dysfunction within the "Rock Around Washington" group had not affected B.W.'s grades in her class. Additionally, the Parents were not informed of the two disturbing essays written by B.W.

That night, B.W. brought the Kennewick Essay home and the Parents read it. The next day, R.W. e-mailed Brousseau, the co-principals, and Plano. She wrote that the Kennewick Essay was "disturbing" and "read like a cry for help." She stated that B.W.'s failure to observe the assignment's scoring rubric, as well as his resultant low grade on the essay, contradicted Brousseau's insistence at the previous day's meeting that B.W.'s grades had not suffered as a result of the discord within his "Rock Around Washington" group. R.W. also questioned how Mr. Miller's report could have failed to mention the Kennewick Essay, given that the essay was used as a vehicle to express B.W.'s aversion to his alleged harasser.

Instead of responding to R.W., Brousseau e-mailed Budzius and Mr. Miller

the following:

> Just so you know all the facts. What [the Mother] and [the Father] are reacting to is the . . . expository paragraph in which [Student A] gets hurt. This is NOT the . . . narrative that I gave to you which was way worse and had [Student A] mentally retarded at the end. What the [Parents] have in their hands was supposed to be an expository paragraph on a city in WA. I corrected his "moment" paper first by about a week and only realized that in the expository paragraph he was revisiting the same issue. [The Student] would have written the expository paragraph first and then the "moment" paper which is the exact opposite of how I corrected them. Therefore, my reaction to the second writing was probably stronger because I had already read the first, nastier paper. The [Parents] have NOT seen the "moment" paper. They will probably think that it is double the evidence of his harassment, but I see it as double the meanness. I will put a copy of both papers in your box today.
>
> Do I bring this up with the [attorney] investigator?

Budzius was surprised to learn that Brousseau had not provided the Parents with a copy of the Moment Essay. Nonetheless, Budzius still did not disclose to the Parents the existence of the Moment Essay. Budzius chose not to reveal this information to the Parents because she was concerned that they would make the conversation about her, as had happened in the past, rather than focusing on B.W.

In Mr. Miller's two responses to Brousseau's November 16 e-mail, he acknowledged that, contrary to Brousseau's assertions, B.W.'s negative relationship with Student A may have affected B.W.'s performance, including his grades, in Brousseau's class. In fact, B.W. earned his lowest grades in Brousseau's class. Shortly after the two incidents of racial harassment, Brousseau reported that B.W. was testing in the "C" and "D" range. By the end of the first trimester, he received a "C" in her social studies class. He earned

- 11 -

"A's" and "B's" in his other classes.

On November 1, after receiving Mr. Miller's report, the Parents filed a complaint on behalf of B.W. Plano issued a decision on November 4 under the District's Harassment, Intimidation, and Bullying policy. Plano concluded that Mr. Miller's investigation of the October 25 incident was "sufficiently thorough in its scope and intensity" and included appropriate preventative measures, despite finding no corroboration of B.W.'s allegations. However, because the Parents wanted an investigation to be conducted under the District's Nondiscrimination Policy and Procedure, and because their complaint included two incidents, Plano stated his desire to have an attorney conduct the investigation.

Plano represented to the Parents that Rachel Miller, the attorney chosen to conduct the investigation, was an "outside attorney" and an "unbiased observer" who would work on behalf of all those involved. However, Plano did not inform the Parents that Ms. Miller was a partner in a law firm that regularly served as the District's legal representative. Plano also did not inform the Parents that, in the event that they appealed his decision, that law firm would represent the District.

On November 4, the Parents contacted the OSPI's Equity and Civil Rights Office and learned of their rights under Washington law, which the District had failed to include in its Nondiscrimination Policy and Procedure. The Parents then appealed Plano's November 4 decision to the District board of directors. However, noting the existence of Ms. Miller's ongoing investigation under the Nondiscrimination Policy and Procedure, the board of directors denied the

Parents' appeal.

On November 29, Ms. Miller issued a report on her investigation, in which she found no support for B.W.'s allegations. On November 30, Plano adopted Ms. Miller's report as the basis for finding against the Parents under the District's Nondiscrimination Policy and Procedure.

While Ms. Miller's interviews were significantly more thorough than those that were conducted by Budzius and Mr. Miller, Ms. Miller still omitted significant facts from her report and failed to consider important matters in her conclusions.

- Ms. Miller's report did not address the fact that three students involved in the first incident had said that Student A had used racial slurs in reference to B.W., including "stupid Black," "Brownie," and "Indian." Ms. Miller had, herself, elicited statements from Students B and C that Student A had referred to B.W. as "Brownie" and "Indian."

- Ms. Miller's report contained no analysis of the two disturbing essays and did not reference them in the conclusions.[8] Despite interviewing B.W., Ms. Miller, did not ask him why he wrote about the injuries to Student A. Despite speaking with both Budzius and Mr. Miller, Ms. Miller did not ask why they failed to speak with B.W. about the essays or offer him counseling. Furthermore, she did not consider whether the essays tended to corroborate B.W.'s allegations or tended to show a substantial interference with B.W.'s educational environment. Finally, she failed to

---

[8] The essays were, however, appended to Ms. Miller's report. In fact, the Parents first learned of the Moment Essay by reviewing Ms. Miller's report.

consider whether the District's decision not to disclose the existence of the essays to the Parents tended to show that the District improperly handled their complaint.

- Ms. Miller's report failed to consider whether the precipitous drop in B.W.'s grades in Brousseau's class constituted evidence that the racial harassment had had an adverse effect on his educational environment.

- Ms. Miller's report did not address the contextual connection between the discussion of Mexico and Mexican food in Brousseau's class on the day of the second incident (a fact that had come to light as a result of her interview with Student A) and B.W.'s version of the events that followed.

- Ms. Miller did not measure the District's actions against the standards imposed by statute and regulation. She also failed to observe that the District's Nondiscrimination Policy and Procedure, which purportedly governed her investigation, was not in compliance with applicable law. Thus, she also did not address whether the District's failure to comply with applicable law affected its handling of B.W.'s complaint, or the Parents' ability to pursue their grievance promptly and properly.

In a later attempt to explain the aforesaid omissions, Ms. Miller characterized the scope of her inquiry as being limited to fact finding. Yet, in her report, Ms. Miller went beyond fact finding: indeed, she drew conclusions as to whether the evidence of racial slurs was substantial and consistent; whether there was a severe or persistent effect on B.W.'s educational environment; and

whether the District's actions in response to the Parents' complaint were adequate to ensure a positive educational environment.

It was also so that, even during the course of Ms. Miller's investigation, members of the District staff continued to focus on B.W. as the source of the problem. For instance, when Mr. Miller was interviewed by Ms. Miller, he told her about B.W.'s special education history and his "behavioral challenges." Mr. Miller did not, however, tell Ms. Miller about Student A's behavioral issues. Additionally, Mr. Miller selected one teacher—in addition to Brousseau—for Ms. Miller to interview. This teacher, Natasha Robsen, had had negative experiences with B.W. Yet, Mr. Miller did not direct Ms. Miller to any of B.W.'s other teachers with whom he had had more positive experiences. Moreover, Mr. Miller did not direct Ms. Miller to any of Student A's teachers—some of whom had had negative experiences with Student A.

Upon reading Ms. Miller's report—including an attached written statement from Brousseau containing negative comments about B.W.—the Parents immediately transferred B.W. out of Brousseau's class. The Parents had previously asked Miller and the board of directors whether Student A could be transferred rather than having to transfer B.W. Although Mr. Miller had told the Parents that he would follow up with them regarding their request, he did not do so.

After transferring out of Brousseau's class, B.W. earned "A's" throughout the school year. His new teacher, Alexis Guerriero, who was unaware of the harassment complaint throughout her time teaching B.W., reported that he turned

his work in on time, showed an eagerness to learn, and behaved well in general. The few behavioral issues that arose were quickly corrected and were not thereafter repeated.

On December 16, the Parents appealed Plano's November 30 decision to the District board of directors. The board of directors found that the District's policies and procedures had not been violated and that there was no significant evidence that B.W. had been subject to harassment or discrimination. It therefore ruled against the Parents.

On February 2, 2012, the Parents filed an appeal with the OSPI pursuant to former WAC 392-190-075 (2011).[9] The OSPI, in turn, designated the Office of Administrative Hearings (OAH) to hear and issue a final decision. The OAH appointed Administrative Law Judge (ALJ) Michelle Mentzer to hear the appeal.

A hearing was held over the course of several days in the summer of 2012.[10] The Parents did not retain counsel. The District was represented by Ms. Miller's law firm.

During the hearing, the District focused on B.W.'s behavioral problems and history of receiving special education. In fact, the District sought to offer into evidence 18 exhibits concerning B.W.'s special education history.[11] The District's strategy was consistent with the response of its staff to B.W.'s allegations, which had been to attribute responsibility for any discord to B.W.'s social deficits.

---

[9] This provision required the OSPI to conduct a formal administrative hearing.
[10] In May 2012, the District brought its Nondiscrimination Policy and Procedure into compliance with chapters 28A.642 RCW and 392-190 WAC. It also appointed a nondiscrimination compliance coordinator, as required by chapter 392-190 WAC.
[11] Only two were admitted.

On October 15, 2012, ALJ Mentzer issued an order, in which she made findings of fact and drew conclusions of law. The ALJ found it more likely than not that B.W. was the target of racial slurs in both reported incidents. The ALJ further found that the District had failed, during the course of its investigations, to consider numerous facts relevant to B.W.'s allegations. The ALJ also found that, although the District had outlined a series of "Next Steps" in response to B.W.'s allegations, the District had failed to implement them all.

The ALJ proceeded to consider the effects of the District's failure to comply with chapters 28A.642 RCW and 392-190 WAC. In doing so, the ALJ made the following pertinent findings:

> Based on the formal and tenacious manner in which the [Parents] have approached this case, it is found that they may have pursued the following steps if District policies and procedures had complied with the law. The District's non-compliance with the law deprived them of these opportunities. They may have immediately contacted the District's nondiscrimination compliance coordinator upon hearing their son's reports and requested a District-level, rather than a building-level investigation. If the District had truthfully informed them of its relationship with [its law firm], the [Parents] may have requested that either the compliance coordinator or an unaffiliated law firm conduct the investigation; and may have declined to allow their son to be interviewed by [the District's law firm]. A District-level investigation—whether by the nondiscrimination compliance coordinator or an attorney investigator—would likely have been more thorough than Ms. Budzius' and Mr. Miller's quick and inadequate investigations. A District-level investigation would more likely have included interviews of Students B and C. The racial slurs they disclosed might have come to light during the two weeks that intervened between October 11th (when the first incident was reported) and the second incident on October 25th. Much of the turmoil [B.W.] experienced during the month of October, as evidenced by his disturbing essays and poor LASS grades, and the further turmoil of experiencing the second incident, might have been avoided had the District adequately investigated the first incident and taken

appropriate steps to discipline Student A, instead of taking steps based on the assumption that [B.W.] heard a racial slur in his mind, but not necessarily with his ears.

ALJ Mentzer then reflected upon the appropriate standard for assessing the District's response to B.W.'s allegations. In doing so, she noted that this court had, in the case of S.S. v. Alexander, 143 Wn. App. 75, 177 P.3d 742 (2008), "provided guidance on the legal standard to be used in cases of student-on-student discriminatory harassment." After examining our decision in S.S., which involved a private action for the recovery of money damages under Title IX of the Education Amendments of 1972, the ALJ adopted the standard applied in that case, which extends liability to instances wherein a school district in receipt of federal funds has actual notice of peer sex discrimination and yet responds with "deliberate indifference." See S.S., 143 Wn. App. 75.

Applying the "deliberate indifference" standard, the ALJ concluded that "the District's actions were clearly unreasonable in light of known circumstances" and, thus, constituted deliberate indifference. These actions included the following: failing to update the District's Nondiscrimination Policy and Procedure as required by law; failing to appoint a nondiscrimination compliance coordinator as required by law; inadequately investigating each incident; inadequately disciplining Student A for his role in each incident; failing to complete the "Next Steps" listed in Mr. Miller's report; failing to disclose the Moment Essay to the Parents; failing to consider either the Moment Essay or the Kennewick Essay in any of the investigations; focusing on B.W. and his social deficits as the reason for his conflict with Student A; disregarding evidence that corroborated B.W.'s

allegations; misrepresenting to the Parents that Ms. Miller was an outside attorney working for all parties involved; and adopting Ms. Miller's report, which omitted relevant facts and reached unjustified conclusions.

By way of relief, the ALJ ordered the District to provide at least six hours of training to its nondiscrimination compliance coordinator and at least three hours of training to all District principals and assistant principals concerning the requirements of chapters 28A.640 RCW, 28A.642 RCW, and 392-190 WAC.[12] The ALJ also ordered the District to continue its annual presentations to middle schools students regarding harassment, intimidation, and bullying, and to ensure that harassment on the basis of race and ethnic origin would be addressed.

The District exercised its right of appeal to the King County Superior Court. It did not, however, challenge the factual findings of ALJ Mentzer. Instead, the District maintained that the facts found did not support the legal conclusion that it had been deliberately indifferent to the incidents of racial harassment. In opposing the District's superior court appeal, the Parents were again without counsel.

The superior court agreed with the District and, on December 9, 2013, reversed ALJ Mentzer's decision.

The Parents now appeal from the superior court's order.

---

[12] Set forth in these chapters are rules and regulations meant to eradicate discrimination in Washington public schools on the basis of sex, race, and other characteristics.

- 19 -

II

The "deliberate indifference" standard was applied both in the administrative hearing and on administrative appeal in superior court. Represented by counsel, the Parents now assert that this standard was inappropriate. The proper standard, they contend, was that which is used by the United States Department of Education's Office of Civil Rights in administrative enforcement proceedings under Title VI of the Civil Rights Act of 1964[13] (hereinafter OCR Standard). We agree. Because the Parents elected to pursue relief through an administrative enforcement process, the OCR Standard—as the federal counterpart of the procedure chosen by the Parents—was the proper standard.

A

We review the ALJ's decision under the standards set forth in chapter 34.05 RCW, the Washington Administrative Procedure Act (WAPA). Gradinaru v. Dep't of Soc. & Health Servs., 181 Wn. App. 18, 21, 325 P.3d 209, review denied, 181 Wn.2d 1010 (2014). "In reviewing an agency's order, the appellate court sits in the same position as the superior court." City of Seattle v. Pub. Emp't Relations Comm'n, 160 Wn. App. 382, 388, 249 P.3d 650 (2011). Accordingly, our review is "limited to the record of the administrative tribunal, not that of the trial court." City of Seattle, 160 Wn. App. at 388. Because the parties have not challenged the facts as found by the ALJ, we treat those findings as

---

[13] 42 U.S.C. §§ 2000d to 2000d-7.

- 20 -

verities on appeal. Dep't of Labor & Indus. v. Allen, 100 Wn. App. 526, 530, 997 P.2d 977 (2000).

"The process of applying the law to the facts . . . is a question of law and is subject to de novo review." Tapper v. State Emp't Sec. Dep't, 122 Wn.2d 397, 403, 858 P.2d 494 (1993). "Where an administrative decision involves a mixed question of law and fact, 'the court does not try the facts de novo but it determines the law independently of the agency's decision and applies it to facts as found by the agency.'" City of Seattle, 160 Wn. App. at 388 (quoting Renton Educ. Ass'n v. Pub. Emp't Relations Comm'n, 101 Wn.2d 435, 441, 680 P.2d 40 (1984)). In reviewing questions of law, we may substitute our own determination for that of the agency. City of Seattle, 160 Wn. App. at 388. "We will reverse if the [agency] 'erroneously interpreted or applied the law.'" Gradinaru, 181 Wn. App. at 21 (quoting RCW 34.05.570(3)(d)).

B

In 2010, our legislature passed the equal education opportunity law (EEOL). LAWS OF 2010, ch. 240. The EEOL forbids discrimination in Washington public schools on the basis of "race, creed, religion, color, national origin, honorably discharged veteran or military status, sexual orientation including gender expression or identity, the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a person with a disability." RCW 28A.642.010. The EEOL was necessary, the legislature found, because although "numerous state and federal laws prohibit discrimination on other bases in addition to sex, the common school provisions in Title 28A RCW

do not include specific acknowledgement of the right to be free from discrimination because of race . . . ." RCW 28A.642.005.

The EEOL was not conceived in a void—rather, its enactment came in the wake of two prior legislative undertakings. The first was the formation of an advisory committee "to craft a strategic plan to address the achievement gap for African-American students." LAWS OF 2008, ch. 298, § 2. The second was the formation of the Achievement Gap Oversight and Accountability Committee, the purpose of which was "to synthesize the findings and recommendations from the 2008 achievement gap studies into an implementation plan, and to recommend policies and strategies to the superintendent of public instruction, the professional educator standards board, and the state board of education to close the achievement gap." LAWS OF 2009, ch. 468, § 2.

The legislature found "that one of the recommendations made to the legislature by the [Achievement Gap Oversight and Accountability Committee] . . . was that the [OSPI] should be specifically authorized to take affirmative steps to ensure that school districts comply with all civil rights laws, similar to what has already been authorized in chapter 28A.640 RCW with respect to discrimination on the basis of sex." RCW 28A.642.005. Heeding this recommendation, the legislature delegated to the OSPI the power to enforce and obtain compliance with the EEOL "by appropriate order made pursuant to chapter 34.05 RCW." RCW 28A.642.050. The OSPI was also authorized to enforce and obtain compliance with any rules and guidelines that it adopted under the EEOL. RCW 28A.642.050. As a means of obtaining compliance, the OSPI was permitted to

terminate funding, eliminate programs, institute corrective action, and impose sanctions.[14] RCW 28A.642.050. The legislature did not set forth a standard for compliance with the EEOL but, rather, directed the OSPI to "establish a compliance timetable, rules, and guidelines for enforcement of this chapter." RCW 28A.642.030.

i

In May 2011, the OSPI promulgated rules pursuant to this directive. See former ch. 392-190 WAC (2011). Significantly, though, the OSPI did not articulate its own standard for compliance with the EEOL. Instead, it made known that "compliance with relevant federal civil rights law should constitute compliance with those similar substantive areas treated in this chapter . . . ." Former WAC 392-190-005 (2011).

In February 2012, the OSPI issued guidelines interpreting both the EEOL and its own rules. This time, the OSPI articulated a specific standard for compliance with the EEOL. "A school district is responsible for addressing discriminatory harassment about which it knows or reasonably should have known." OSPI, Prohibiting Discrimination in Washington Public Schools at 32 (Feb. 2012).[15] "A school district must take prompt and appropriate action to investigate or otherwise determine what occurred." OSPI, supra, at 33. "If an investigation reveals that discriminatory harassment has occurred, the school

---

[14] These enforcement mechanisms were illustrative, rather than enumerative. See RCW 28A.642.050.
[15] Available at http://www.k12.wa.us/Equity/pubdocs/ProhibitingDiscriminationInPublicSchools.pdf#cover.

district must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring." OSPI, supra, at 33. "Discriminatory harassment creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school district." OSPI, supra, at 32.

In October 2014, the OSPI amended its own rules. In doing so, it embraced the compliance standard set forth in its 2012 guidelines.

> (1) For purposes of administrative enforcement of this chapter . . . a school district or public charter school violates a student's rights regarding discriminatory harassment . . . when the following conditions are met:
> . . .
> (b) The alleged conduct is sufficiently severe, persistent, or pervasive that it limits or denies a student's ability to participate in or benefit from the school district's or public charter school's course offerings, including any educational program or activity (i.e., creates a hostile environment); and
> (c) The school district or public charter school, upon notice, fails to take prompt and appropriate action to investigate or fails to take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.
> (2) For purposes of administrative enforcement of this chapter . . . the [OSPI] deems a school district or public charter school to have notice of discriminatory harassment if a reasonable employee knew, or in the exercise of reasonable care should have known, about the harassment.

WAC 392-190-0555.

ii

Following the OSPI's initial engagement in formal rulemaking in 2011, individuals seeking to enforce the EEOL's nondiscrimination mandate had at their disposal two distinct remedial processes: a judicial enforcement process and an administrative enforcement process.

The judicial enforcement process was constructed by the legislature. In the EEOL, the legislature expressly included a private right of action and authorized relief in the form of damages: "Any person aggrieved by a violation of" the EEOL or the OSPI's rules or guidelines "has a right of action in superior court for civil damages and such equitable relief as the court determines." RCW 28A.642.040.

The administrative enforcement process, on the other hand, was a product of agency rule. As part of its original rulemaking, the OSPI authorized an administrative complaint procedure. See former WAC 392-190-065, -070, -075 (2011). This procedure provided: "Anyone may file a complaint with a school district alleging that the district has violated this chapter." Former WAC 392-190-065.[16] Complainants were given the right to appeal a school district decision to a school district board of directors. Former WAC 392-190-070. If still unsatisfied, complainants could appeal to the OSPI. Former WAC 392-190-075. The OSPI

---

[16] In May 2011, the OSPI also mandated that the superintendent of each school district "immediately" designate a nondiscrimination compliance coordinator. Former WAC 392-190-060 (2011). A compliance coordinator was to be responsible for investigating any complaints filed pursuant to former WAC 392-190-065 (2011). However, as found by ALJ Metzner, the District did not appoint a compliance coordinator until May 2012—after the Parents initiated administrative enforcement proceedings.

- 25 -

would then be required to conduct a formal administrative hearing in conformance with the WAPA.[17, 18] Former WAC 392-190-075.

iii

What are we to make of this flurry of legislative and regulatory activity? Unfortunately, the regulatory activity that would be of most use in determining the proper standard for compliance with the EEOL in administrative enforcement proceedings postdated the events in dispute, leaving us with limited guidance in resolving an issue that is unlikely to resurface, given that the OSPI has since interpreted, and then amended, its own regulations. Nonetheless, because the events occurred at the time that they did, we are left with the task of determining the proper standard in the intervening months between the OSPI's original rulemaking in May 2011 and the guidelines it subsequently issued in February 2012. During this period, the OSPI's guidance was limited to the following: "compliance with relevant federal civil rights law should constitute compliance with those similar substantive areas treated in this chapter . . . ." Former WAC 392-190-005. Accordingly, we turn our attention to federal civil rights law: namely, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 to 1688.

---

[17] The OSPI could delegate its authority to render a final decision to an ALJ, which it did in this matter. Former WAC 392-190-075.

[18] This procedure was altered in 2014. As a result, the OSPI is no longer required to conduct a formal administrative hearing and can no longer delegate its authority to render a final decision. Instead, the OSPI, upon receipt of an appeal, is permitted—but not required—to investigate the matter itself. WAC 392-190-075. Following an investigation, the OSPI must make an independent determination of compliance or noncompliance and must issue a written decision to the parties that addresses the allegations in the complaint and any other noncompliance issues uncovered during the investigation. WAC 392-190-075.

C

Title VI provides that "[n]o person . . . shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Similarly, Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Notwithstanding the fact that only racial harassment has been alleged in this matter, both Titles VI and IX are significant to our analysis because the United States Supreme Court "has interpreted Title IX consistently with Title VI." Barnes v. Gorman, 536 U.S. 181, 185, 122 S. Ct. 2097, 153 L. Ed. 2d 230 (2002).

Titles VI and IX, both of which were enacted pursuant to Congress's power under the Spending Clause,[19] "operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286, 118 S. Ct. 1989, 141 L. Ed. 2d. 277 (1998); see generally Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 181, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005); Guardians Ass'n v. Civil Serv. Comm'n of City of New York, 463 U.S. 582, 598-99, 103 S. Ct. 3221, 77 L. Ed. 2d 866 (1983). "When Congress acts pursuant to its spending power, it generates legislation 'much in the nature of a contract: in

---

[19] U.S. CONST. art. I, § 8, cl. 1.

return for federal funds, the States agree to comply with federally imposed conditions.'" Davis ex rel. LaShonda D. v. Monroe County Bd. of Educ., 526 U.S. 629, 640, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L. Ed. 2d 694 (1981)); see also Guardians, 463 U.S. at 599 ("The mandate of Title VI is '[v]ery simple. Stop the discrimination, get the money; continue the discrimination, do not get the money.'" (alteration in original ) (quoting 110 Cong. Rec. 1542 (1964) (Rep. Lindsay))). "In interpreting language in spending legislation," the Supreme Court "insis[t][s] that Congress speak with a clear voice,' recognizing that '[t]here can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the Congress] or is unable to ascertain what is expected of it.'" Davis, 526 U.S. at 640 (some alterations in original) (quoting Pennhurst, 451 U.S. at 17).

i

"The *express* statutory means of enforcement [of Titles VI and IX] is administrative," Gebser, 524 U.S. at 280 (emphasis added), which is to say that both statutes are enforced by federal departments and agencies that condition receipt of federal funding upon compliance with statutory nondiscrimination mandates. See 42 U.S.C. § 2000d-1 (authorizing certain federal departments and agencies to enforce the nondiscrimination mandate of Title VI); 20 U.S.C. § 1682 (authorizing certain federal departments and agencies to enforce the nondiscrimination mandate of Title IX).

- 28 -

The United States Department of Education is one such department. The task of ensuring that recipients of United States Department of Education funding are in compliance with Titles VI and IX has been left to that department's Office of Civil Rights (OCR). To that end, the OCR has set forth detailed standards for compliance with Titles VI and IX. Failure to comply with these standards may trigger administrative enforcement proceedings, which may result in a cessation of United States Department of Education funding.

Generally speaking, the OCR will find a school district to be in violation of Title VI when it fails to respond appropriately to instances of peer racial harassment—of which it had actual or constructive notice—that are sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school.[20] See "Dear Colleague Letter"[21] from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. (Oct. 26, 2010) (hereinafter Racial Harassment Letter).[22]

In more specific terms, a school receives notice of peer racial harassment "if a responsible employee knew, or in the exercise of reasonable care should

---

[20] A similar standard is used in the Title IX context: "If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." "Dear Colleague Letter" from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., at 4 (April 4, 2011). Available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[21] "Dear colleague letters are guidance documents written to educational administrators that explain the OCR's legal positions and enforcement priorities." Matthew R. Triplett, Note, Sexual Assault on College Campuses: Seeking the Appropriate Balance Between Due Process and Victim Protection, 62 DUKE L.J. 487, 488 n.5 (2012).

[22] Available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

have known, about the harassment." Racial Harassment Letter at 2 n.9.[23] "Harassment creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school." Racial Harassment Letter at 2. Once a school has actual or constructive notice of peer racial harassment, "it must take immediate and appropriate action to investigate or otherwise determine what occurred." Racial Harassment Letter at 2. While "specific steps in a school's investigation will vary depending" on a number of factors, every investigation "should be prompt, thorough, and impartial." Racial Harassment Letter at 2. "If an investigation reveals that discriminatory harassment has occurred, a school must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring." Racial Harassment Letter at 2-3.

ii

While there is evidence that Congress assumed a private right of action could be brought under both statutes, Cannon v. Univ. of Chicago, 441 U.S. 677, 699-701, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979), Congress did not, in either statute, expressly supplement the administrative enforcement apparatus with a

---

[23] The OCR has used the actual or constructive notice inquiry for some time. See, e.g., Racial Incidents and Harassment Against Students at Educational Institutions: Investigative Guidance, 59 Fed. Reg. 11448, 11450 (March 10, 1994) ("If discriminatory conduct causes a racially hostile environment to develop that affects the enjoyment of the educational program for the student(s) being harassed, and if the recipient has actual or constructive notice of the hostile environment, the recipient is required to take appropriate responsive action.")

private right of action. Nevertheless, the Supreme Court has held that both statutes are enforceable through an implied private right of action. See Cannon, 441 U.S. at 703; see generally Alexander v. Sandoval, 532 U.S. 275, 279-80, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001) (observing that "[t]he reasoning of [Cannon] embraced the existence of a private right to enforce Title VI as well" as Title IX). In judicially implying a private right of action, the Court recognized that the administrative procedure for terminating federal financial support is "severe and often may not provide an appropriate means of" protecting individual citizens against discriminatory practices "if merely an isolated violation has occurred." Cannon, 441 U.S. at 704-05. Hence, the Court determined that an implied right of action was "fully consistent with—and in some cases even necessary to—the orderly enforcement" of Titles VI and IX. Cannon, 441 U.S. at 705-06.

Subsequently, in Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 73-76, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992), the Supreme Court "clarif[ied] that damages were available as a Title IX private action remedy." S.S., 143 Wn. App. at 94; cf. Barnes, 536 U.S. at 185 (observing that "monetary damages were available" under Title IX "[a]nd the Court has interpreted Title IX consistently with Title VI").

In summary, the Supreme Court implied a private right of action under both statutes in Cannon and subsequently authorized relief in the form of damages in Franklin. And yet, in Franklin, the Court recognized that liability under both statutes could be constrained by the source of the power pursuant to which they had been enacted. See 503 U.S. at 74 (considering whether

- 31 -

Spending Clause statutes authorize monetary awards for intentional violations); accord S.S., 143 Wn. App. at 95. Above all, the Court was troubled by the prospect of a recipient of federal funds being held liable for the payment of damages without receiving the requisite notice. See Franklin, 503 U.S. at 74 ("The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award."); accord S.S., 143 Wn. App. at 95. However, because the "notice problem" did not arise in Franklin—which involved teacher-student sexual harassment—the Court did not, at that time, "purport to define the contours" of a school district's liability for teacher-student sexual harassment. Gebser, 524 U.S. at 281.

"The Supreme Court revisited the relationship between Title IX and teacher-student sexual harassment six years later [in Gebser]." S.S., 143 Wn. App. at 95. The Gebser Court refused to hold a school district liable for teacher-student sexual harassment on the basis of traditional tort theories of liability: namely, those of constructive notice and respondeat superior. In doing so, the Court adopted a stringent standard for imposing liability on school districts in receipt of federal funds, which is often referred to as the "deliberate indifference" standard.[24]

---

[24] This was a familiar standard. It was introduced by the Supreme Court in the context of claims for cruel and unusual punishment in violation of the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). It was subsequently adopted "for claims under [42 U.S.C.] § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation." Gebser, 524 U.S. at 291.

In Gebser, the Court determined that it would be inconsistent with the Spending Clause origins of Title IX to impose damages liability on funding recipients based on principles of constructive notice or respondeat superior liability. Gebser, 524 U.S. at 285. Instead, the Court concluded, "that damages may not be recovered . . . unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." Gebser, 524 U.S. at 277. The Court stated this rule more broadly later in the opinion:

> [A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to initiate corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

Gebser, 524 U.S. at 290.

S.S., 143 Wn. App. at 95-96.

The effect of Gebser was to establish the liability standard in private actions for the recovery of damages predicated upon teacher-student sexual harassment and brought pursuant to Title IX. The Court did not at that time, however, determine whether the same standard would be applicable to instances of peer sexual harassment.

The following year, the Court examined "the interplay between peer (student-on-student) sexual harassment and Title IX [in Davis]." S.S., 143 Wn. App. at 96. In Davis, the Court extended the "deliberate indifference" standard to instances of peer sexual harassment, concluding that "recipients may be liable for their deliberate indifference to known acts of peer sexual harassment." 526 U.S. at 648. In reaching this conclusion, the Court made clear that "funding recipients are deemed 'deliberately indifferent' to acts of student-on-student

harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648.

D

Although, admittedly, our lengthy explication of state and federal authority suggests that the task of determining the proper standard in this matter will be equally laborious, the truth is much more agreeable: all that remains is to identify the federal analog to the means of recourse pursued by the Parents in this matter. See former WAC 392-190-005 ("compliance with relevant federal civil rights law should constitute compliance with those similar substantive areas treated in this chapter . . ."). More to the point, we must determine whether the means of recourse pursued by the Parents finds its Title VI analog in the judicially implied right of action for the recovery of damages or the administrative remedial scheme expressly authorized by statute. In doing so, we consider not only the facially distinctive features of these federal schemes, but also the underlying policy considerations that gave rise to their existence.

Even though the proceedings before the ALJ and in superior court yielded contrary results, they were reached through application of the same standard: "deliberate indifference." Now, on appeal, the Parents contend that the deliberate indifference standard was inapt. Given that these were administrative enforcement proceedings, the Parents assert, the proper standard was that

which is used by the OCR in administrative enforcement proceedings.[25] We agree.

The Parents had a choice: pursue enforcement of the EEOL's nondiscrimination mandate through either judicial or administrative means. They chose the latter.[26] The District does not dispute this. Moreover, the Parents did not seek—and, indeed, could not have obtained—an award of monetary damages as a result of their administrative enforcement efforts.[27] The District does not dispute this. Consequently, it would seem that the federal analog to the

---

[25] The District contends that the Parents should be judicially estopped from arguing for reinstatement of the ALJ's order on the basis of the OCR Standard. The District maintains that, were the Parents permitted to argue for a more lenient standard, the District would be unfairly prejudiced and the Parents would be unfairly benefited. We disagree.

"'Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.'" Arkison v. Ethan Allen, Inc., 160 Wn.2d 535, 538, 160 P.3d 13 (2007) (quoting Bartley-Williams v. Kendall, 134 Wn. App. 95, 98, 138 P.3d 1103 (2006)). The doctrine is meant to preserve respect for judicial proceedings and to avoid "inconsistency, duplicity, and waste of time." Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 861, 281 P.3d 289 (2012). However, "[a]pplication of the doctrine may be inappropriate '"when a party's prior position was based on inadvertence or mistake."'" Arkison, 160 Wn.2d at 539 (quoting New Hampshire v. Maine, 532 U.S. 742, 753, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (quoting John S. Clark Co. v. Faggert & Frieden, PC, 65 F.3d 26, 29 (4th Cir. 1995))). Moreover, "judicial estoppel may be applied only in the event that a litigant's prior inconsistent position benefited the litigant or was accepted by the court." Taylor v. Bell, __ Wn. App. __, 340 P.3d 951, 958 (2014).

Judicial estoppel was not designed as a trap for the unwary. In both proceedings, the Parents, without the assistance of counsel, argued that the District had been deliberately indifferent to the racial harassment suffered by their son. More to the point, the Parents argued that they had satisfied a more demanding burden of proof than that which they now, with the assistance of counsel, propose. The District does not explain what benefit the Parents could have unfairly gained from having to meet a more demanding burden of proof.

In all likelihood, the Parents' prior position was a byproduct of inadvertence or mistake—influenced, perhaps, by the manner in which the District, which has been represented by counsel throughout these proceedings, argued its position. In recognition of this, in recognition of the fact that we are applying a remedial statute, and because the Parents did not benefit from their prior position, we decline to apply the doctrine of judicial estoppel.

[26] The Parents followed the administrative procedure prescribed by the OSPI. Initially, they filed a complaint with the school district. They then appealed to the school district's board of directors. Finally, they appealed to the OSPI, which conducted a "formal administrative hearing" as required by former WAC 392-190-075 (emphasis added).

[27] In order to obtain monetary damages, the Parents would have had to bring a private action against the District in superior court, as expressly authorized by the legislature in the EEOL. RCW 28A.642.040.

Parents' administrative enforcement efforts lies in the Title VI administrative enforcement apparatus, meaning the OCR Standard would apply.

The District, however, argues that the OCR Standard is unsuitable. This is so, it asserts, because the administrative hearing over which ALJ Mentzer presided constituted a "quasi-judicial review" of the District's decision. The District does not dispute that the Parents availed themselves of the administrative enforcement procedure authorized by the OSPI; however, it maintains that the adversarial nature of the administrative hearing is akin to the judicially implied private right of action for the recovery of money damages under Title VI, rather than its administrative enforcement apparatus. The District overplays the significance of the ALJ's involvement.

As a consequence of its preoccupation with the adversarial trappings of the administrative hearing, the District fails to perceive or, perhaps, fully appreciate, the genesis of the deliberate indifference standard. The concerns that moved the Supreme Court to adopt the stringent standard of "deliberate indifference" are not present here. In fashioning a remedy for the implied private right of action for the recovery of money damages, the Court perceived the need for a standard that would ensure that recipients of federal funds would be held liable for money damages only upon receiving proper notice, given that "the receipt of federal funds under typical Spending Clause legislation is a consensual matter." Guardians, 463 U.S. at 596. Thus, in Gebser, the Court required "that 'the receiving entity of federal funds [have] notice that it will be liable for a monetary award'" before it could be subjected to liability for damages. 524 U.S.

at 287 (quoting Franklin, 503 U.S. at 74). Nevertheless, where a "funding recipient engages in intentional conduct that violates the clear terms of the statute," the Court has held that damages may be awarded. Davis, 526 U.S. at 642. However, liability must arise as a result of "'an official decision by the recipient not to remedy the violation.'" Davis, 526 U.S. at 642 (quoting Gebser, 524 U.S. at 290). An official decision not to remedy the violation presupposes that the recipient had actual knowledge that the violation existed, meaning that liability may not be imputed to the recipient as a result of actions taken by its charges or employees. See Davis, 526 U.S. 629; Gebser, 524 U.S. 274.

Notwithstanding the absence of support for the District's position, we wish, before proceeding further, to dispel any lingering confusion regarding the erstwhile enforcement procedure availed of by the Parents. In enacting the EEOL, the legislature directed the OSPI to enforce and obtain compliance with the EEOL. The legislature did not, however, restrict the means by which the OSPI could accomplish this directive; presumably, it was left to the OSPI's discretion. Hence, the OSPI's decision to enlist the aid of individuals and the OAH in discharging its statutorily mandated duty constituted an unremarkable exercise of its discretion.[28] The OSPI's exercise of its discretion did not, however, transform an administrative complaint procedure into a private right of action and it did not transmute administrative recourse into money damages. To

---

[28] The adversarial features of the administrative hearing, in all likelihood, signified a belief held by the OSPI that such features would promote its objective. While the OSPI may no longer hold this belief, as evidenced by its recent amendments, the fact that it can alter its enforcement procedure is further indication that the "quasi-judicial" review with which the District takes issue owed its existence to the OSPI's favor.

suggest otherwise is to misapprehend the division of labor between the legislature and the OSPI.

Still, the District warns that, in the event that the OCR Standard is applied herein, the Parents could argue for res judicata in a civil suit based on the ALJ's findings. While the District's desire to avoid a money judgment based on collateral estoppel is no doubt understandable, it is not germane to our inquiry. The question of what standard applies in an administrative enforcement proceeding is not resolved by reference to a conceivable litigation strategy in a hypothetical lawsuit.

In brief, we conclude that the OCR Standard was the proper standard to apply. Nevertheless, we consider and apply both standards herein.

III

We begin with the standard of deliberate indifference. The Parents contend that the superior court erred in reversing the ALJ's order. They maintain that, in addition to violating the OCR Standard, the District's response constituted deliberate indifference. We agree.

In order to satisfy the deliberate indifference standard, the Parents were required to establish the following: (1) racial discrimination; (2) knowledge by an appropriate person of the discrimination; (3) deliberate indifference by the District; and (4) discrimination that was sufficiently severe, pervasive, and objectively offensive that it can be said to have deprived the victim of access to the educational opportunities or benefits provided by the school. See S.S, 143 Wn. App. at 98-117.

The District does not dispute that B.W. was subjected to peer racial discrimination and it does not dispute that an appropriate person knew of the discrimination. Instead, the District maintains that its response to the discrimination was not deliberately indifferent and that the discrimination was not sufficiently severe, pervasive, and offensive that it can be said to have deprived B.W. of access to the educational opportunities or benefits provided by the District.

A

The District, in asserting that its response was not deliberately indifferent, adopts a misguided methodology, which we characterize as a "divide and conquer" approach. Rather than considering the circumstances as a whole, the District considers facts in isolation and asserts that they do not rise to the level of deliberate indifference. This approach is at odds with S.S., wherein we stated that "[a] funding recipient acts with deliberate indifference when it responds to a report of a discriminatory act in a manner that is clearly unreasonable *in light of all of the known circumstances*." 143 Wn. App. at 103 (emphasis added) (citing Davis, 526 U.S. at 629). Stated differently, in considering whether the District's response constituted deliberate indifference, we "unite and consider."

In S.S., we amassed an array of decisions in which other courts have found responses to constitute deliberate indifference. The following observations are based on those decisions. Initially, "An institution's failure to properly investigate a claim of discrimination is frequently seen as an indication of deliberate indifference." S.S., 143 Wn. App. at 104. Yet, "Conducting an

investigation and then doing nothing more may also constitute deliberate indifference." S.S., 143 Wn. App. at 105. Indeed, the "failure to meaningfully and appropriately discipline the student-harasser is frequently seen as an indication of deliberate indifference." S.S., 143 Wn. App. at 104. Along the same lines, "treating the abuser and the abused equally has been seen as being deliberately indifferent to the discriminatory acts." S.S., 143 Wn. App. at 105.

We begin with the District's informal investigations. As an initial matter, the District failed to conform in a timely manner to both the mandates of the EEOL and the OSPI's May 2011 regulations. Specifically, it neglected both to amend its Nondiscrimination Policy and Procedure to extend coverage to racial discrimination and to appoint a nondiscrimination compliance coordinator. As a result of the District's failure to amend its Nondiscrimination Policy and Procedure, the Parents were not aware of their rights at the time that they filed their initial complaint on behalf of B.W. As a result of the District's failure to appoint a compliance coordinator, the co-principals were not informed of the District's obligations under the EEOL and the OSPI's May 2011 regulations.

The co-principals conducted inadequate investigations. While the District's failure to appoint a compliance coordinator may, perhaps, be partially to blame, both Budzius and Mr. Miller failed to follow the procedure under which they were purporting to investigate. For example, following the first incident, Budzius interviewed only two of the four students working together on the same group project. While Mr. Miller did manage to interview all of the students involved in the second incident, he failed to consider the two incidents in concert.

Thus, as found by ALJ Mentzer, both failed to meet the minimum investigative requirements imposed by the District's procedure on "Prohibition of Harassment, Intimidation, and Bullying."

To make matters worse, the reasons Budzius provided for not interviewing two of the four students were found by the ALJ to be not credible. Budzius stated that she believed that Student A was telling the truth and had no reason to lie, whereas she believed that B.W., who has Asperger's syndrome and who, according to Budzius, had difficulty reading social cues, heard the word "stupid" but added "Black" in his own mind. However, Budzius could not explain how B.W.'s condition would affect his ability to hear a racial epithet and accurately report that which was said.

In addition, Mr. Miller's brief interviews failed to reveal critical facts that Ms. Miller later uncovered—specifically, that the group had been discussing Mexico, which, as found by the ALJ, contextualized the remark made by B.W. to Student B, and gave further credence to B.W.'s allegations. Even more troubling is the fact that Mr. Miller continued to informally investigate the incident, despite the fact that R.W. had told him she wished to file a formal complaint, which would have been handled by the District, as opposed to the school. Although he continued with his informal investigation, Mr. Miller failed, ultimately, to include in his report any mention of the Moment Essay. The Moment Essay undeniably constituted corroborating evidence of B.W.'s allegations. Yet, Mr. Miller did not address it in his report and the school's staff proceeded to shield it from the Parents until its existence was disclosed by Ms. Miller.

As with the informal investigations, the formal investigation was fraught with inadequacies. Ms. Miller did not ask B.W. about the two disturbing essays he had written; she did not ask Brousseau, Budzius, or Mr. Miller to explain why they had withheld the existence of the essays from the Parents; in fact, she made no mention of B.W.'s two disturbing essays in her report;[29] she did not account for the conspicuous discrepancy between B.W.'s grades in other classes and his grades in the class he shared with his harasser; and she did not address the ostensible connection between the discussion of Mexico and Mexican food and the racially charged comments between Student A, Student B, and B.W.

In addition to its failure to conduct an adequate investigation, the District failed to meaningfully and appropriately discipline Student A. In fact, it appears that the only discipline Student A received as a consequence of his acts of racial harassment was a reminder from Brousseau not to use race as the basis for angry comments and a request that he sign an "anti-harassment contract."[30] Whether this can be characterized as "discipline" is debatable; whether the response was proportional to the harassment is not.

Furthermore, the District refused to consider any scenario in which B.W. was not to blame for the conflict with Student A. As found by ALJ Mentzer, the District's staff believed that the conflict was due to B.W.'s social deficits. They were frustrated that, because B.W.'s Parents had withdrawn their consent to

---

[29] She did append the essays to her report. Upon reading the report, the Parents learned, for the first time, of the existence of the second essay.

[30] The District suggests that it also disciplined Student A by suspending him for one day. The record rebuts this suggestion. Student A was suspended as a consequence of his role in the crab apple incident.

allow B.W. access to special education, they were unable to provide B.W. with assistance in overcoming his perceived social deficits. As a result, they refused to consider the possibility that B.W.'s claims of harassment could be legitimate, despite knowing that Student A had had a slew of serious behavior problems.

Considered together, these facts establish that the District's response to the harassment suffered by B.W was clearly unreasonable. Thus, ALJ Mentzer did not err in concluding that the District was deliberately indifferent. Yet, we must also consider whether the harassment was sufficiently severe, pervasive, and objectively offensive so that it can be said to have deprived B.W. of access to the educational opportunities or benefits provided by the school.

B

The District contends that, even in the event that its response to the harassment was deliberately indifferent, the Parents failed to show that the harassment was sufficiently severe, pervasive, and objectively offensive so that it can be said to have deprived B.W. of access to the educational opportunities or benefits provided by the school. According to the District, "The type of harassing comments Student A made are the type of remarks that—while likely hurtful— were the type of non-physical, immature name-calling and teasing that the Davis Court held to be insufficient to be actionable harassment . . . ." Br. of Resp't at 42. We disagree.

Federal courts have distinguished use of "reviled epithet[s]" from the "simple teasing and name-calling among school children" that the Davis Court suggested would not be actionable in the context of a Title IX claim. See Zeno v.

Pine Plains Cent. Sch. Dist., 702 F.3d 655, 659, 666-67 (2d Cir. 2012) (concluding that a jury could have found actionable harassment where high school student attending "a racially homogenous school" was subjected to "frequent pejorative references to his skin tone"); DiStiso v. Cook, 691 F.3d 226, 242-43 (2d Cir. 2012) (where kindergarten student allegedly called "blackie" and "nigger" by peers, "such conduct, particularly use of the reviled epithet 'nigger,' raises a question of severe harassment going beyond simple teasing and name-calling"); see also Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1034 (9th Cir. 1998) (where African-American ninth grade student called "nigger" by white children and where that epithet was written on the walls in civics and social studies classrooms, court ruled that complaint set forth sufficient allegations of a racially hostile environment).

That which occurred here went beyond simple teasing or name calling. Student A made it clear to B.W. not only that his skin color made him look physically different from his peers, but that it also was the basis for a lack of intelligence. "Shut up, you stupid Black" leaves no doubt as to the perceived cause of a lack of intelligence. Furthermore, because both incidents took place in the context of a group setting, B.W. was repeatedly humiliated in front of his peers and reduced to tears. In fact, during the second incident, Student B joined Student A in taunting B.W. It is not difficult to imagine the emotional toll that these instances of harassment could take on a seventh grade boy in an unfamiliar environment. Yet, there is no need to imagine: the emotional stress suffered by B.W. was evidenced by crying in front of his peers, submitting

disturbing essays to his teacher who blamed him for the conflict with Student A, and receiving uncharacteristically low grades. Based on the foregoing, we determine that the ALJ did not err in concluding that the harassment experienced by B.W. subjected him to a hostile environment. Nevertheless, we must still consider whether the hostile environment deprived B.W. of equal access to educational opportunities or benefits.

"Under the rule announced in Davis," we observed, "a total bar or exclusion from educational opportunities need not be demonstrated." S.S., 143 Wn. App. at 114. Instead, "It is the denial of 'equal access to an institution's resources and opportunities' that is the key." S.S., 143 Wn. App. at 114 (quoting Ray v. Antioch Unified Sch. Dist., 107 F. Supp. 2d 1165, 1168 (N.D. Cal. 2000)). "Educational benefits include an academic environment free from racial hostility." Zeno, 702 F.3d at 666. A "dropoff" in grades can provide "necessary evidence of a potential link between" a student's diminished educational opportunities and harassment experienced. Davis, 526 U.S. at 652.

The ALJ did not err in concluding that B.W. was denied equal access to his school's educational opportunities or benefits. B.W. was forced to remain in the same class with his harasser for a period of time, which, unsurprisingly, coincided with B.W.'s poor performance in that class. Indeed, part of B.W.'s poor performance stemmed from his submission of two essays in which he described Student A suffering terrible injuries; in one of these essays, the injury to Student A occurred immediately following an instance of Student A verbally harassing B.W. B.W.'s poor performance stood in stark contrast to his high achievement in

his other classes. When B.W. was transferred to a different class, his grades promptly went up to match his high achievement in his other classes.

In conclusion, the ALJ did not err in holding that the District acted with deliberate indifference to B.W.'s reports of discriminatory harassment, and thereby discriminated against him in violation of the EEOL. Yet, unlike the ALJ, we proceed to consider whether, under the OCR Standard, the Parents have also established a violation of the EEOL.

IV

Unlike the deliberate indifference standard, the OCR Standard requires that, upon receiving actual or constructive notice of racial harassment, the school "take immediate and appropriate action to investigate or otherwise determine what occurred." Racial Harassment Letter at 2. It further requires that every investigation "should be prompt, thorough, and impartial." Racial Harassment Letter at 2. Finally, it imposes upon a school the duty to "take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring." Racial Harassment Letter at 2-3.

As noted by the District, the OCR Standard is more lenient than the deliberate indifference standard. Rather than obligating the Parents to show that the District's response was "clearly unreasonable," the OCR Standard demands that the District take "immediate and appropriate action to investigate" and "prompt and effective steps" to "end the harassment."

Under this more lenient standard, and applying the ALJ's factual findings

to the requirements of this standard, it is abundantly clear that the District's response violated the EEOL. The District's many missteps, which have been chronicled herein, need not be revisited in order to conclude not only that the District failed to take immediate and appropriate action to investigate but that it failed to take prompt and effective steps to end the harassment, eliminate the hostile environment, and prevent the harassment from recurring. Therefore, although we conclude that the District violated the EEOL under both standards, we hold that its failure to abide by the OCR Standard—which is the proper standard for this administrative enforcement proceeding—was the source of its EEOL violation. Consequently, we reverse the superior court's order on administrative appeal and reinstate the decision of the Office of Superintendent of Public Instruction, as entered by its designee administrative law judge.

We concur:

_____

_Dwyer, J._

_Leach, J._

<u>No. 71419-8-I, Mercer Island School District v. Office of the Superintendant</u>
<u>of Public Instruction, N.W. and R.W. on behalf of R.W.</u>

VERELLEN, A.C.J. (concurring). I concur in part. I agree that even under the deliberate indifference standard advocated by the Mercer Island School District (the District), the Office of Superintendent of Public Instruction's (OSPI) decision should be affirmed. Specifically, the undisputed findings of fact support deliberate indifference in the form of the vice principals' incomplete investigations, the failure of teachers and administrators to meaningfully acknowledge and responsibly act upon B.W.'s troublesome reaction to the peer-on-peer harassment, and the District's failure to timely provide important information to B.W.'s parents. Consistent with the undisputed findings of fact, I also agree these were not merely incidents of teasing and name calling, and B.W.'s access to educational opportunities was severely impacted.

I write separately because I would end the analysis at this point. For three reasons, I would not further explore the Office of Civil Rights (OCR) standard and how or whether it applies during this interim period. First, there is a minimal opportunity to provide helpful guidance. As detailed in the lead opinion, OSPI guidelines and regulations went into effect after this administrative hearing. The new OSPI regulation likely governs any pending case. Second, the legislature and OSPI remain free to dramatically alter or fine tune the enforcement standards applicable to future cases. Future standards may or may not include a similar OCR standard discussed in this appeal. Finally, and most importantly, not far below the surface lurks a potentially troubling question. Case law in this arena distinguishes between an administrative action that does not seek money damages and an implied cause of action under Title VI or Title XI for money damages implicating the federal spending clause. But what is the

impact if a student and the student's parents undertake a "purely" administrative action as a first step, and if successful, then pursue the second step of a claim for money damages under Title VI or XI asserting that the administrative determination of discrimination is res judicata in the action for money damages? Would such a two-step process implicate the spending clause and call into question the standard used to determine discrimination at the administrative level?[1] If this question unfolds in a future appeal, I would prefer to address it under the then-applicable enforcement standards without any possible misunderstandings or unintended consequences arising from the alternative arguments the parents have raised in this appeal. Because this appeal may be resolved narrowly on the deliberate indifference standard, I would save any additional discussion for another day.

_____

[1] The question is not purely academic. At oral argument, counsel for the parents and B.W. acknowledged that they have filed a Title VI claim for money damages.