IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| YORDANOS MATEWOS and PETROS SHEFARE,<br><br>Appellants,<br><br>v.<br><br>NATIONAL BEVERAGE CORPORATION d/b/a SHASTA BEVERAGE INCORPORATED, a foreign corporation; NICHOLAS HEATON, CASSIE HEATON and their marital community,<br><br>Respondents. | No. 82662-0-I I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |
| SHAUNTE CANNADY and CAMILE CHAVON CANNADY,<br><br>Appellants,<br><br>v.<br><br>NATIONAL BEVERAGE CORPORATION d/b/a SHASTA BEVERAGE INCORPORATED, a foreign corporation; NICHOLAS HEATON, CASSIE HEATON and their marital community,<br><br>Respondents. | |
| DARRYL ROBERTS and ADRIENNE ROBERTS,<br><br>Appellants, | |

Citations and pin cites are based on the Westlaw online version of the cited material.

v.

NATIONAL BEVERAGE CORPORATION
d/b/a SHASTA BEVERAGE
INCORPORATED, a foreign corporation;
NICHOLAS HEATON, CASSIE HEATON
and their marital community

ANDRUS, C.J. — Three employees of National Beverage Corporation d/b/a Shasta Beverage Incorporated ("Shasta") challenge the summary judgment dismissal of sexual and racial harassment and race discrimination claims under the Washington Law Against Discrimination (WLAD).[1] Because genuine issues of material fact exist with regard to these claims, we reverse.

FACTS

In 2018 and 2019, Darryl Roberts, Shaunte Cannady, and Yordanos Matewos, three Black or African American employees at Shasta's Tukwila plant, filed separate lawsuits against Shasta and its plant manager, Nicholas Heaton, alleging violations of the WLAD and negligent supervision. Because we review a summary judgment order, we view the facts in the light most favorable to the nonmoving parties, here the plaintiffs.

Darryl Roberts

Roberts, who began working at the Shasta Tukwila plant in 2010, was the only Black employee at the time. Roberts raised a concern about this fact with Shasta early in his tenure with the plant. He called the human resources department to complain that Shasta was discriminating against Blacks. Shasta's

---

[1] RWC ch. 49.60.

Equal Employment Opportunity Information Sheet forms show that Shasta's Tukwila plant, with 75 employees, had a single Black employee in 2010, and between 1 and 4 Black employees between 2011 and 2016. The number rose to 10 in 2017.

Also, early in his employment, he began experiencing racist remarks directed at him by fellow co-worker, Chhin Sim. Sim routinely used racial slurs in front of Roberts, such as the "N word." He also called Roberts racial epithets such as "monkey" and "g[o]rilla." Roberts testified that he reported the harassment to Heaton and to Shasta's human resources department several times, but never received a response. Heaton testified in a declaration that Roberts informed him that Sim had used racial slurs toward him, but in his deposition, Heaton stated he could not recall being told that Sim had used the "N word".

Shasta had employed Sim at the plant since 1996. There is evidence in the record that management employees at Shasta knew Sim was engaging in misconduct on the job. In 2012, Sim received a written warning for harassing and sending threatening text messages to another employee. In 2013, former employee Elvira Lopez complained to Shasta management that Sim was harassing her. Heaton "counseled" Sim to leave Lopez alone, but took no other disciplinary action.

Multiple employees testified that Sim and Heaton were close, a relationship that Sim apparently flaunted, saying things like "I can do whatever I want I own this place" and "I have been here 22 years, Nick is my friend and I can do whatever I want." In 2010, Heaton posted a bail bond for Sim to obtain his release from jail.

He did so again in August 2011, when Sim was charged with driving on a suspended license and operating a vehicle without an ignition interlock.[2] At the end of 2013, Heaton's superiors reprimanded him for showing favoritism toward employees and bailing employees out of jail.

Sometime in early 2017, Heaton accused Roberts of smelling of cannabis and required him to leave the job site to obtain a drug test. According to Roberts, Heaton made this accusation only after Roberts challenged management's right, under the union collective bargaining agreement, to transfer him to the production line.[3] When Roberts denied Heaton's allegation of drug use, Heaton threatened to call the police in front of other employees. Heaton then followed Roberts as he left the building, talking into his cell phone as if he were in fact speaking to the police. When Roberts returned with negative test results, he told Heaton he intended to file an Equal Employment Opportunity Commission (EEOC) complaint and seek legal counsel. Heaton testified that Roberts was not a good employee because "[h]e was argumentative."

Roberts filed his lawsuit on January 9, 2019. A few days later, two female Shasta employees provided statements to the employer in which one alleged that Roberts had sexually harassed her and one alleged that he had engaged in inappropriate conduct toward her. Randy Elliot, a Shasta production supervisor,

---

[2] There is significant evidence in the record that alcohol abuse contributed to Sim's legal and work problems. One employee, Gerald Maines, when interviewed by Shasta human resources, reported that Heaton was aware Sim had to wear an ankle bracelet as a result of a criminal conviction for driving while intoxicated. Roberts and other employees reported that Sim was often intoxicated at work.

[3] The Tukwila plant's hourly production employees are unionized and represented by Teamsters Local 117.

tried unsuccessfully to obtain similar statements from other female employees. On January 16, 2019, Shasta suspended Roberts pending an investigation into the complaints. In mid-February 2019, it notified Roberts that it was terminating his employment for violating the company's non-discrimination and anti-harassment policy, and for his "failure to adhere to reasonable workplace conduct standards."

Shaunte Cannady

Shasta hired Cannady to work at the plant in January 2017. He was employed there from January 3, 2017 until March 29, 2017, during what employees called their 90-day probationary period. Under Shasta's collective bargaining agreement with the union, Shasta has "ninety (90) calendar days of continuous employment after the initial date of hire to evaluate a new employee during which the employee may be terminated with or without just cause." After this probationary period, Shasta cannot discipline or terminate employees without just cause. Sixty days into his 90-day probationary period, Cannady received a positive review from production supervisor, Chris Holmes. Cannady testified he never received any discipline while working at Shasta.

On March 6, 2017, two of Cannady's African American co-workers, Miquan Powe and Brian Jenkins, told Cannady about the presence of racist graffiti in the men's bathroom. Canady saw a sign on a stall wall on which someone had written the phrase "Make Shasta White Again." Canady complained to an "upper management" employee named Joe. Joe told him he would look at the graffiti and report it to his "higher ups."

Powe, upset over the sign, took a picture of it and reported its presence to his supervisor, Randy Elliot:



Cannady testified that four other employees saw the graffiti at the same time and "everyone was upset about it." He described the "whole vibe for the rest of the night was like a lot of edginess, a lot of people were just on edge from seeing that." Several of the employees told Joe that they wanted to go home and that the company needed to do something about it.

Cannady returned to work next on March 11, 2017, and saw that someone had crossed out the phrase "Make Shasta White Again," but someone had also re-written the same words with a black "Sharpie" below the same statement. He took a picture of the second writing:



Powe testified that he found a second sign, similar to the first, bearing handwritten graffiti that read: "And we hired [a] zoo keeper to tend the monkeys."



Cannady, upset that the language remained in the bathroom, went to complain to Heaton and to ask why nothing had been done. Cannady was later shocked to see that this graffiti remained in place until the end of his shift that evening.[4]

Heaton testified he did not notify the corporate office about the graffiti, conducted no investigation into the incident to determine the perpetrator's identity, and thought he had taken care of the problem by holding a plant meeting and telling employees that the graffiti was "unacceptable."

---

[4] Mike Whitney, Shasta's maintenance supervisor, testified that he removed the graffiti that afternoon. Heaton testified that Whitney would have done this work before Whitney left at 1:30 pm, well before the end of Cannady's shift. Heaton, however, could not recall verifying that it had been removed.

Within days, on March 14, 2017, Holmes sent an e-mail to Heaton and other Tukwila plant supervisors recommending that Shasta terminate Cannady's employment at the end of his 90-day probationary period because he "w[h]ines too much about things." Holmes testified that he saw Cannady socializing when he should have been packing product. He also stated that the day before his March 14 e-mail, he heard Cannady refusing to assist in packing "variety packs" when instructed to do so. But another plant supervisor, Waylon Smith, responded to Holmes's e-mail that he had "no issues" with Cannady. Shasta terminated Cannady on March 29, 2017.

Cannady filed this lawsuit on March 5, 2018. In discovery, Shasta stated that the reason for Cannady's termination was "at least several weeks prior to his termination, Shasta management observed Mr. Cannady failing to meet job performance standards. Mr. Cannady's performance issues included, without limitation, displaying reluctance to perform certain tasks that were within his job duties." Holmes testified that while Cannady was interested in his job at first, "he started having attitude about doing the work." He testified that about a month before Shasta terminated Cannady, Cannady was instructed to hand stack some variety packs and Cannady refused, saying "I wasn't hired to . . . do this." According to Holmes, Cannady made this statement to, or in front of, Teresa Davis. Cannady, however, presented evidence that Davis could not have reported negative work experiences with him before Holmes' March 14, 2017 e-mail criticizing his work because the work schedules showed Cannady only worked

under Davis the first full week when he started in January (when Heaton stated Cannady was doing a good job) and then again on March 15 and 16.

Cannady also denied ever expressing any reluctance to work with the variety pack product and denied socializing in a way that interfered with his work. Heaton testified he has no recollection of Cannady's work performance, relied on his supervisors' assessment of Cannady's work, and did nothing to substantiate the supervisors' claims.

<u>Yordanos Matewos</u>

Matewos began her employment with Shasta in November 2016. Sim began sexually harassing her shortly after she started. On multiple occasions, Sim inappropriately touched her hips and back against Matewos' protests, often touting his seniority at Shasta. Sim also frequently winked and blew kisses at Matewos while they worked. In January 2017, Sim began texting Matewos outside of work and late at night, despite the fact that Matewos had not provided him with her phone number. Multiple other Shasta employees witnessed Sim's harassment of her over the years.

Sim also subjected Matewos to racial harassment, frequently using racial slurs in her presence and referring to Black employees as "monkeys." The racial harassment was not limited to Sim; on one occasion, Gene Bowen, husband of Terri Bowen, Shasta's administrative coordinator, stated to Matewos, who is originally from Eritrea, that he thought Africans only ate zebras and lions.

These incidents culminated on July 21, 2017, when Sim walked into the Shasta breakroom, kicked a chair out from under Matewos' feet, and yelled at her

"take your fucking feet off the chair, [N word]." Multiple other employees were in the breakroom at the time and witnessed the incident. One of them, Gerald Maines, testified that he and another coworker reported the incident to the supervisors, including Heaton, but nothing was done. Heaton admitted he knew about the incident before Matewos left on vacation a few days later. Nevertheless, Heaton took no steps to investigate while she was away. Sim continued to work at Shasta as scheduled.

When Matewos returned, she went to speak with Heaton about the incident at her coworkers' urging. Heaton was initially dismissive of the report and Matewos believed Heaton was pressuring her to drop her complaint. However, shortly after Matewos reported the incident, two other women came forward to report that Sim had sexually harassed them as well. On August 29, 2017, after Heaton continued to push Matewos to drop her complaint, Matewos threatened to file a report with the EEOC if Shasta failed to take corrective action. That same day, Shasta obtained written statements from the two other women detailing harassment by Sim. One employee, Daniela Moreno, detailed extensive physical harassment by Sim. She explained why people were afraid to complain about Sim:

> I think that people don[']t say things about him because they are scared of him . . . I think people perceive him as getting away with whatever he wants to do. . . . They know he has gotten away with harassing people, sexually, with threats of violence, etc. He also likes to flaunt his relationship with Nick [Heaton]. For example, showing everyone a [F]acebook message Nick sent him apologizing for having to [reprimand] him due to an issue with his behavior at work. It is my opinion that him flaunting his relationship with Nick in that way, is him saying to us "you can[']t touch me."

Sim confirmed in his deposition that Heaton took care of him and watched him at work like a "big brother." Shasta fired Sim on September 1, 2017.

Matewos filed her lawsuit against Shasta and Heaton on March 11, 2018. On March 14, 2018, Shasta issued a disciplinary action notice to Matewos for "stealing time," engaging in "actions detrimental to morale," and "leaving the plant without clocking out." In the months following, Shasta managers, including Randy Elliot, frequently wrote Matewos up for minor infractions without her knowledge. Matewos testified that she saw Elliot "sneak around watching me" and wrote her up for being late when she was on time.

Shasta eventually terminated Heaton in June 2020, partially due to his tendency to pick favorites among the employees at the Tukwila plant.

The three plaintiffs asserted claims under WLAD and claims of negligent supervision and their spouses claimed loss of consortium.[5] The trial court dismissed all of the claims on summary judgment. Roberts, Cannady, and Matewos appeal.

ANALYSIS

Standard of Review

We review a summary judgment order de novo and perform the same inquiry as the trial court. *Specialty Asphalt & Constr. v. Lincoln County*, 191 Wn.2d 182, 191, 421 P.3d 925 (2018). A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." CR 56(c). We view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Owen v. Burlington N. and Santa Fe R.R.*

_____
[5] The trial court consolidated the three cases as King County Superior Court Case No. 18-2-05883-0 SEA.

*Co.*, 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).  To overcome summary judgment in a discrimination case, an employee must do more than express an opinion or make conclusory statements, but if the record contains reasonable but competing inferences of both discrimination and nondiscrimination, the trier of fact must determine the true motivation.  *Specialty Asphalt,* 191 Wn.2d at 191-92.

<u>Hostile Work Environment Claims</u>

The employees first argue the trial court erred in dismissing their hostile work environment claims on summary judgment.  We agree.

WLAD proscribes employment discrimination on the basis of sex, race, and other protected characteristics.  RCW 49.60.030.  RCW 49.60.180(3) makes it an unfair practice for an employer "[t]o discriminate against any person in compensation or in other terms or conditions of employment because of . . . sex [or] race."  One form of a sex or race discrimination claim under RCW 49.60.180(3) is a claim of a hostile work environment.  *Antonius v. King County*, 153 Wn.2d 256, 261, 103 P.3d 729 (2004).  To establish a prima facie hostile work environment claim, an employee must demonstrate that they experienced offensive conduct that was (1) unwelcome, (2) because the employee was a member of a protected class, (3) affecting the terms or conditions of employment, and (4) imputable to the employer.  *Glasgow v. Georgia–Pacific Corp.*, 103 Wn.2d 401, 406–07, 693 P.2d 708 (1985).

1.  <u>Matewos' Claim of Sexual and Racial Harassment</u>

Shasta does not dispute that Matewos satisfied the first three elements of a prima facie claim for hostile work environment.  The only issue is whether the

evidence is sufficient to impute the harassment to Shasta. To demonstrate that the harassment is imputable to the employer,

> the employee must show that the employer (a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action. This may be shown by proving (a) that complaints were made to the employer through higher managerial or supervisory personnel or by proving such a pervasiveness of sexual harassment at the work place as to create an inference of the employer's knowledge or constructive knowledge of it and (b) that the employer's remedial action was not of such nature as to have been reasonably calculated to end the harassment.

*Glasgow*, 103 Wn.2d at 407. Whether management at Shasta's plant knew or should have known that Sim was sexually harassing Matewos is a question of fact. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 339 (6th Cir. 2008). So too is whether Shasta failed to take reasonable prompt and adequate corrective action. *LaRose v. King County*, 8 Wn. App. 2d 90, 113, 437 P.3d 701 (2019).

Shasta argues Matewos cannot prove that it knew Sim was harassing her until she reported it to Heaton on her return from vacation. The record, however, establishes genuine issues of fact on that question.[6] First, Heaton testified he

---

[6] To demonstrate Shasta's knowledge of Sim's conduct, the plaintiffs offered Gerald Maines's testimony that "over the years, I was aware of several women that complained [about Sim's conduct] including Mandy Rowe and Stephanie Anderson. It was my understanding that Stephanie Anderson complained to Mr. Heaton as well." Shasta argued that this statement was inadmissible because Maines lacked personal knowledge of what other women had or had not reported to Heaton. The trial court indicated in its summary judgment orders that it did not consider Maines's testimony on this basis. Plaintiffs challenge this evidentiary ruling on appeal. As a general rule, a witness must testify on the basis of facts or events that the witness has personally observed. 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 602.2 (6th ed. 2016). There is no evidence that Maines personally observed any woman complaining to Heaton about Sims. The court's ruling was therefore not an abuse of discretion. A witness, however, may testify about a statement he has heard, regardless of personal knowledge of its truth, when the testimony is offered for the limited purpose of showing the effect of the statement upon the witness's state of mind. 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 602.4 (6th ed. 2016); *State v. Hudlow*, 182 Wn. App. 266, 278, 331 P.3d 90 (2014). Maines's state of mind could be relevant at trial if Shasta challenges his failure to report the sexual harassment himself. If we consider Maines's testimony solely for the limited purpose of demonstrating that he did not report Sim's sexual harassment because he was of the impression several women had already done so,

- 13 -

heard about the July 21 incident the following day and took no action to investigate it until Matewos returned three weeks later. Maines also testified that he and another coworker who witnessed the incident reported it to Shasta supervisors and Heaton directly after the fact. And even after Matewos reported Sim's harassment, there is evidence that Heaton resisted taking any corrective action. Both Maines and Matewos stated that Heaton "did not want to hear it" when Matewos talked to him about Sim and that Heaton wanted Matewos to drop her complaint.

Second, an employer's knowledge of a particular employee's past acts of harassment of other women may be a basis for a jury finding that the employer had constructive knowledge of the harassment of the plaintiff. *Hawkins*, 517 F.3d at 340. The record establishes that Sim and Heaton had developed a close relationship over the 20 years that they worked together at Shasta. Multiple employees testified that the two were friends. Heaton's superiors even expressed concern to him regarding the closeness of his relationship with some employees and his apparent "favoritism."

Maines testified that Sim sent him pornographic texts and when Maines asked Sim to stop, Sim became angry and threatened him, which Maines reported to Heaton. Heaton's response was that Maines had no proof and it was just his word against Sim's. When Heaton scheduled Maines to work with Sim after he had threatened him, he complained to Heaton. Again, Heaton did nothing and forced Maines to work with Sim. Maines also saw Sim storing pornographic materials in Heaton's office under his desk calendar.

---

we need not disregard it on summary judgment. We will consider the challenged testimony for that limited purpose.

- 14 -

Shasta's records confirm it was aware Sim had threatened one employee in 2012 and had harassed former employee Elvira Lopez.[7] Employee Miquan Powe testified that Sim "had a reputation for mistreating the female workers and others[,] but it was understood he got away with it because of his relationship with Nicholas Heaton."[8] Matewos stated she believed Sim got away with his misconduct due to his relationship with Heaton. Mandy Rowe stated that Heaton "had a practice of treating female employees differently," "let Mr. Sim's conduct continue," and "favored certain male employees."[9] Roberts stated that he

---

[7] Maines testified that after Sim "grabbed Elvira Lopez and tried to kiss her," Maines "followed up with Ms. Lopez and she confirmed to [Maines] that she reported it to Mr. Heaton." Shasta argued below that this testimony constituted inadmissible hearsay. On appeal, Shasta also contends that Maines failed to establish personal knowledge of what Lopez reported to Heaton or Shasta's subsequent response to her report. As with Maines's comment about other women having reported Sim's harassing conduct, his testimony about what Lopez told him would similarly be admissible for the limited purpose of establishing his state of mind. And this testimony is also admissible under ER 803(a)(3), if offered for a purpose other than the truth of the matter asserted. As the employees argue in their reply brief, it may be admissible to explain why they did not take their complaints about Sim to Heaton. *See Rice v. Offshore Sys., Inc.*, 167 Wn. App. 77, 272 P.3d 865 (2012) (hearsay in police report admissible to show employer's motivation for terminating employee). And even if Maines's testimony may not be used to prove that Lopez actually reported Sim's harassment to Heaton, neither Shasta nor Heaton dispute that they knew of Lopez's complaints. Heaton admitted that he was aware that Lopez "felt that Mr. Sim was paying too much attention to her." Maines's testimony concerning Lopez's report is thus redundant of evidence in the record.

[8] Shasta objected to the Powe declaration below as being "undated and unsigned," but the trial court identified the declaration as one on which it relied in granting summary judgment. Shasta did not renew that objection on appeal. Under RAP 9.12, this court considers any evidence listed by the trial court as having been considered by it in ruling on summary judgment.

[9] Rowe testified that "everyone" knew about Sim's conduct toward women. Shasta objected to this testimony as lacking foundation and the court declined to consider it on summary judgment. Under ER 602, "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Because the rule only requires evidence sufficient to support a finding of personal knowledge, courts admit testimony if a "trier of fact could reasonably find that the witness had firsthand knowledge." *State v. Vaughn*, 101 Wn.2d 604, 611-12, 682 P.2d 878 (1984). Rowe did not explain the basis for her opinion that "everyone knew" of Sim's misconduct. It is possible that she based this statement on the fact that Rowe saw Sim openly engaging in harassing conduct so regularly and in front of so many coworkers that it would be difficult to conclude otherwise. Even if we disregard this particular statement as lacking foundation, as the trial court did, there was significant evidence to which Shasta did not object indicating Sim's conduct was pervasive and observed by many employees over a period of many years.

observed Sim "touching women, kicking women, kissing women," and otherwise "harassing women" on multiple occasions over the years. Maines testified that he saw Sim mistreat multiple female employees over the years and observed him targeting employees who had difficulty communicating in English. After Matewos's 2017 report, three other female Shasta employees reported that Sim had continuously sexually harassed them during their employment at Shasta. This evidence is sufficient to create an issue of fact as to whether Shasta knew or should have known of Sim's harassment.

Although conceding it knew about Lopez's 2013 complaint, Shasta argues that it took adequate corrective action at the time Lopez reported Sim's harassment. It characterizes Lopez's complaint as "[a] remote and isolated complaint of inappropriate behavior with a female employee," reported years before Matewos' employment, to argue that this single complaint is insufficient to impute liability, citing *Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 991 P.2d 1182 (2000). *Francom* is not helpful to Shasta. In that case, a male coworker subjected a female employee to inappropriate comments and touching in July 1993. *Id.* at 849. Francom reported the harassment to Costco management in October 1993, who did not take any disciplinary action until the following year. Francom argued that Costco's delay constituted a failure to take reasonably prompt and adequate corrective action. This court disagreed because Francom and the harasser did not work together again, his conduct never occurred again, and Francom had no evidence that the coworker's conduct was so pervasive that immediate action was needed. *Id.* at 857.

But the record indicates that Sim's racial and sexual harassment was pervasive, continued for years, and affected many women and employees of color, not just Lopez and Matewos. Heaton's response to Lopez's complaint was to tell Sim to leave her alone.[10] He did not put any written warning in Sim's personnel file to document the oral warning he claims he gave Sim. There is evidence he undertook no investigation to determine if Sim's harassment of Lopez was isolated. There is evidence he never followed up to determine if his oral warning had ameliorated the situation. A reasonable trier of fact could find that whatever steps Heaton took to reign in Sim, it was inadequate to protect Matewos and any other female employee. In light of this evidence, a reasonable trier of fact could find that Shasta did not, in fact, take adequate corrective action. The trial court erred in dismissing Matewos' hostile work environment claim.

2. <u>Cannady's and Roberts's Racial Hostile Work Environment Claims</u>

Shasta argues Cannady and Roberts failed to raise a genuine issue of material fact to establish that they each experienced racial harassment sufficiently severe or pervasive to affect the terms or conditions of employment and failed to prove the harassment they experienced is imputable to the employer. We disagree with both contentions.

---

[10] Sim's harassment was not just sexual, but also racial in nature. Matewos heard Sim make numerous racist remarks. In addition to calling her the "N word," Sim told her that "he hated black people," and that "we need to get the monkeys out of the building" and "make Shasta white again." He also showed her racist videos on his phone at work. When a plaintiff is claiming race and sex bias, the trier of fact must determine if the employer discriminates on the basis of that combination of factors, not just whether it discriminates against people of the same race or the same sex. *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1562 (9th Cir. 1994). The evidence of pervasive racist animosity in Shasta's plant further supports Matewos' hostile work environment claim.

As Shasta admitted at oral argument, the racist graffiti its employees encountered in the men's restroom, was incredibly offensive and reasonably viewed by employees of color as threatening. September 16, 2022 oral argument at 12:00.[11] Shasta nevertheless argues that this incident was a single isolated incident insufficient to create a hostile work environment under WLAD, relying on *Washington v. Boeing Co.*, 105 Wn. App. 1, 13, 19 P.3d 1041 (2000) (single instance of Black employee being called by racial epithet, while offensive, was insufficiently pervasive to alter terms of working environment).

But as we noted in *Mercer Island Sch. Dist. v. Office of Superintendent of Pub. Instruction*, 186 Wn. App. 939, 980, 347 P.3d 924 (2015), federal courts now distinguish between the use of reviled racist epithets and "simple teasing and name-calling." *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 659, 666-67 (2d Cir. 2012) (jury could have found actionable harassment where high school student attending "a racially homogenous school" was subjected to "frequent pejorative references to his skin tone"); *DiStiso v. Cook*, 691 F.3d 226, 242-43 (2d Cir. 2012) (kindergarten student allegedly called "blackie" and the "N word" by peers raised question of severe harassment going beyond simple teasing and name-calling); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998) (evidence that white children called African American ninth grade student the "N word" and wrote same epithet on classroom walls sufficient to establish racially hostile environment).

---

[11] https://www.tvw.org/watch/?clientID=9375922947&eventID=2022091046

The correct standard under the WLAD, as under Title VII, is whether the conduct is "severe <u>or</u> pervasive." *Castleberry v. STI Group*, 863 F.3d 259, 264 (3rd Cir. 2017); *Haubry v. Snow*, 106 Wn. App. 666, 675, 31 P.3d 1186 (2001) (to determine if harassment affected conditions of employment, court considers the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance). Under this test, a single incident of racist conduct can create a hostile work environment.[12] *Castleberry*, 863 F.3d at 265. A single use of the "N word" may be adequately severe under this standard. *Castleberry*, 863 F.3d at 264; *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the 'N-word']") (citations and quotations omitted). Whether a single racist incident is severe enough to constitute actionable harassment is a question of fact to be determined considering the totality of circumstances. *Glasgow*, 103 Wn.2d at 406.

In light of the evidence Roberts submitted, regarding the historically low number of Black and African American employees at this plant, the persistent racist remarks and epithets leveled at Roberts and other employees of color as their numbers in the plant increased in 2017, and the racist and threatening graffiti to which Cannady and other male employees of color were subjected, there is more

---

[12] Consistent with this case law, Shasta, at oral argument, conceded that a single incident, if sufficiently severe, would be sufficient to state a claim for harassment. September 16, 2022 oral argument at 13:50. https://www.tvw.org/watch/?clientID=9375922947&eventID=2022091046

than sufficient evidence that they both had to endure a racially hostile work environment.

And there is evidence that this graffiti affected the work environment at Shasta. Cannady testified he and other employees wanted to leave the plant and go home because they were afraid. Cannady also testified the graffiti and overall environment at Shasta made him feel "disadvantaged in the workplace" and "sick to [his] stomach." This evidence is sufficient for a jury to find that the racist conduct of his coworkers adversely affected the terms and conditions of his working environment.

Even though Cannady has no evidence that any Shasta employee expressed a racist epithet directly at him, federal courts recognize that a plaintiff need not prove that racially harassing conduct targeted them.[13] "We are, after all, concerned with the 'environment' of workplace hostility." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (supervisor use of racial slurs in general sufficient to establish hostile work environment). *See also Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998) (racial attacks need not be directed at the complainant in order to create a hostile environment). In light of these facts, reasonable persons could reach different conclusions as to whether the harassment altered the conditions of Cannady's employment.

---

[13] Shasta argues that Cannady cannot rely on incidents of harassment not directed at him, citing *Crownover v. State*, 165 Wn. App. 131, 143, 265 P.3d 971 (2011). In that case, this court affirmed the dismissal of a plaintiff's hostile work environment claim on summary judgment because "he admitted he could not identify any objectionable conduct directed at him" within the relevant three-year limitations period. *Id.* *Crownover* is distinguishable, not only because the court dismissed the case on statute of limitations grounds, but also because here, Cannady presented evidence of an extremely serious instance of harassment unquestionably directed at him and all male employees of color who used the bathroom.

There also remain factual questions as to whether this racially hostile work environment can be imputed to Shasta. Shasta argues that "Cannady does not dispute that the graffiti was removed the same day he reported it." The record does not support this argument. Cannady testified he reported the graffiti to his shift lead on the day that he and Powe discovered it on March 6, 2017. Shasta did not remove it until March 11. Cannady stated:

> On March 11, 2017 after having reported the writing on the bathroom stalls, I returned to work and noticed the writing remained on the bathroom stall. . . . I was upset that the language remained in the bathroom and went to Mr. Heaton to again request that it be taken down and to inquire as to why nothing had been done. I could not believe it was still there. I made it clear to him that if something was not done, I would act and do something about it. It still took several hours[,] but by the end of his shift, I noticed that the posters had been removed and the writing was down.

The evidence creates a genuine issue of material fact as to whether Shasta's corrective action was reasonably prompt.

Cannady also established a genuine issue of material fact as to whether Shasta's corrective action was "adequate." Powe testified that Shasta made no attempt to discover who was behind the graffiti, and Maines testified that, although management did make an announcement generally rebuking the graffiti, it only did so on the basis that the writing was "destruction of company property" and did not address its racially discriminatory nature. A jury could also find that Shasta's corrective action did not end the use of racially derogative remarks in the workplace, as the record establishes that Sim continued to use slurs even after the graffiti was removed. The trial court erred in dismissing Cannady's hostile work environment claim.

Roberts, like Cannady, presented sufficient evidence to raise a genuine issue of material fact as to whether he too was subjected to a racially hostile work environment. In addition to the racist graffiti, Roberts described a workplace environment fraught with the use of racial slurs and derogatory remarks. Sim called Roberts the "N word" and a "monkey" on multiple occasions over the years, sometimes around other employees. Roberts reported the harassment to Heaton and to Shasta's human resources department several times, but never received a response. Other employees also overheard Sim state that "the reason we have so many of these monkeys [is] because of Darryl," apparently referencing the fact that Roberts complained about being the only Black employee during the first few years of his employment with Shasta.

Shasta argues that "a handful of incidents during which Sim used repugnant language near Mr. Roberts cannot be sufficiently pervasive to alter the terms or conditions of employment." But the totality of circumstances makes this issue ultimately for the jury to decide. *See Boyer-Liberto v. Fountainbleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015); *Spriggs*, 242 F.3d at 184.

Viewing the evidence in the light most favorable to Cannady and Roberts, the frequent and persistent nature of the harassment reflected in the record establishes a genuine issue of material fact that the harassment they experienced rose to the level of affecting the terms and conditions of their employment and that the harassment can be imputed to Shasta. We therefore reverse the dismissal of Cannady's and Roberts's hostile work environment claim on summary judgment.

Cannady's Discriminatory Discharge Claim

Cannady also appeals the dismissal of his discriminatory discharge claim. Because Cannady presented sufficient evidence to generate jury questions on whether racial discrimination was a substantial factor in his termination, we reverse the trial court's dismissal of this claim.

WLAD prohibits an employer from discharging an employee because of their race. RCW 49.60.180(2). Because direct evidence of discriminatory animus is rare, "plaintiffs may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action." *Mikkelsen v. Pub. Utility Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 526, 404 P.3d 464 (2017). "Summary judgment for an employer is seldom appropriate in employment discrimination cases because of the difficulty of proving discriminatory motivation." *Id.* at 527.

We employ the *McDonnell Douglas*[14] "evidentiary burden-shifting" framework of the evidence of this claim. *Id.* at 526. First, the plaintiff must make a prima facie case of discrimination. To establish a prima facie case of discriminatory discharge, an employee must show that he or she was "(1) within a statutorily protected class, (2) discharged by the defendant, and (3) doing satisfactory work." *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 571, 459 P.3d 371 (2020) (*citing Mikkelsen,* 189 Wn.2d at 527).

Second, if the plaintiff satisfies this initial evidentiary burden, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The employer's burden on this prong is "merely one

---

[14] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

of production, rather than persuasion." *Mikkelsen*, 189 Wn.2d at 533. Third, if the defendant meets this burden, the plaintiff must produce sufficient evidence showing that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext. *Id.* "An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 446-47, 334 P.3d 541 (2014).

The parties dispute whether Cannady established he was doing satisfactory work. Shasta plant supervisor Chris Holmes testified that, although initially "pleased" with Cannady's performance, he later observed Cannady failing to pay attention when operating machinery, socializing with colleagues while working on the variety pack line, and refusing to work on the variety pack line when instructed to do so. In an internal e-mail discussing whether Shasta should retain Cannady following his 90-day probationary period, Holmes gave Cannady a "[t]humbs down" because he "w[h]ines too much."

Cannady, in turn, testified that no one ever complained to him about his work. Shasta argues that Cannady's evaluation of his own good performance is insufficient to survive summary judgment, citing *Chen v. State*, 86 Wn. App. 183, 190-91, 937 P.2d 612 (1997). But in *Chen*, the plaintiff relied solely on his own self-evaluations to establish satisfactory performance. *Id.* Unlike *Chen*, Cannady produced evidence that Holmes gave him a positive performance review shortly

before his discharge. His testimony was further supported by Powe's testimony, who stated that he worked frequently with Cannady "and never heard him complain about working on variety pack. No one to my knowledge ever complained about his work." Cannady thus established a prima facie case of discriminatory discharge.

Because Shasta articulated a legitimate, nondiscriminatory reason for Cannady's termination (dissatisfaction with his work performance), the burden shifts back to Cannady to demonstrate a genuine issue of material fact as to whether the stated reason for termination was pretextual or that discrimination was a substantial factor in his termination. First, Cannady presented evidence undercutting Shasta's contention that Cannady refused a request by Teresa Davis to assist on the variety pack line, as Holmes testified. Cannady's work schedules seem to contradict Shasta's contention that he and Davis worked the same shift before Holmes told Heaton that Cannady "w[h]ined" too much.

Second, the timing of Holmes's criticism of Cannady, occurring within days of Cannady's complaints about the graffiti indicates that Shasta's reasons for firing him may have been pretextual. Based on this evidence, a reasonable jury could conclude that Holmes's statement that Cannady "w[h]ines too much" referred to his complaints about racist graffiti. And we have evidence of the racially charged workplace environment that the Tukwila plant managers, including Holmes and Heaton, appeared to have fostered. Well before Cannady began working at Shasta, non-Black employees frequently used racial slurs and derogatory remarks against African Americans, sometimes in the presence of supervisors. Black

- 25 -

employees felt disadvantaged in the workplace and were often kept together on the same shift. Maines testified that Heaton told him he considered his employees to be either "cowboys" or "Indians," that Maines was acting more like "an Indian" and should act more like a cowboy. Maines, who identifies as Native American, found Heaton's comments offensive. The record also indicates a dysfunctional environment in which employees of color were isolated, targeted, and driven out. From this evidence, a reasonable jury could find that discrimination was a substantially motivating factor in Cannady's termination. The trial court erred in dismissing Cannady's discriminatory discharge claim on summary judgment.

Roberts's Claim of Disparate Treatment

Roberts argues that the trial court also erred in dismissing his disparate treatment claim on summary judgment. We agree.

Disparate treatment discrimination under RCW 49.60.180(3) "is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Shannon v. Pay 'N Save Corp.*, 104 Wn.2d 722, 726, 709 P.2d 799 (1985). To establish a prima facie case of discrimination based upon disparate treatment, a plaintiff must produce facts showing (1) he belongs to a protected class; (2) he was treated less favorably in the terms or conditions of his employment; (3) than a similarly situated, nonprotected employee; and (4) both were doing substantially the same work. *Johnson v. Dep't of Social & Health Servs.*, 80 Wn. App. 212, 227, 907 P.2d 1223 (1996).

Roberts alleges Shasta treated him less favorably than similarly situated white employees in several ways. First, although he disputes the sexual harassment claims made against him, he argues that Shasta took disciplinary measures against him that were harsher than other male employees against whom more serious allegations had been made. Second, he contends Heaton falsely accused him of using drugs and threatened him with arrest when Roberts challenged the factual basis for Heaton's accusation, unlike other similarly situated white employees who, after causing accidents in the plant, were not required to undergo such testing.

There is evidence that the alacrity with which Shasta investigated Roberts differed from its history of investigating other complaints against non-Black employees, including Sim and Holmes. Despite Lopez complaining to Shasta management that Sim was harassing her, Heaton did not consult with human resources, undertake an investigation, or even obtain a written statement from her. Additionally, Shasta's plant administrative coordinator, Terri Bowen, testified that a female employee complained to her that Holmes had touched her inappropriately. There is evidence that Shasta took no action to investigate this complaint. Bowen stated that the complaining employee specifically asked Shasta to take further action against Holmes but despite that request, Bowen chose not to do so and instead addressed her complaint by merely speaking to Holmes about it.

Roberts contrasts Shasta's failure to act in these two cases with the apparent urgency with which it acted on the complaints levied against him. There

- 27 -

is evidence that both women who provided statements about Roberts testified that Shasta management had pushed them to file complaints against him. There is also evidence that these complaints did not arise until days after Roberts filed this lawsuit against Shasta. And neither of the complainants indicated that Roberts ever touched them, unlike those who complained about Holmes and Sim.

Shasta argues that Sim and Holmes are not "similarly situated" with him and thus not valid comparators. Shasta contends that Lopez's complaint against Sim was "too stale to offer any reasonable comparison." But whether a comparator is similarly situated to the plaintiff is usually a question of fact for the fact-finder. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). Generally, a plaintiff must at least show that a comparator (1) had the same supervisor, (2) was subject to the same standards; and (3) engaged in similar conduct without differentiating factors that would distinguish their conduct or the employer's treatment of them. *Id.*

Both Sims and Holmes had the same supervisor as Roberts—Heaton. Both were subject to the same standards of not engaging in sexual harassment in the workplace. And both engaged in inappropriate touching that made female coworkers uncomfortable. This evidence suffices to establish that both are valid comparators.

Shasta relies on *Kirby v. City of Tacoma*, 124 Wn. App. 454, 475, 98 P.3d 827 (2004) for its "too remote in time" argument. In *Kirby*, a police officer alleged he had been subjected to disparate discipline because of his age and disability. He provided evidence that his employer, the police department, had failed to

discipline a former police chief after he confessed to committing an armed rape some eight years earlier. *Id*. at 474-75. This court held that this evidence did not establish disparate treatment in discipline because the events relating to the former police chief were too remote in time and failed to take into effect "numerous personnel and policy changes" that had occurred in the interim. *Id.* at 475.

*Kirby* is not analogous because there was no evidence in that case that the plaintiff had the same supervisor, was subject to the same conduct standards, or engaged in similar conduct. We cannot say, as a matter of law, that Heaton's failure to document or investigate Lopez's allegations of sexual harassment in 2013 and Shasta's vigorous investigation into the allegations of Roberts in 2019 is explainable solely because of the passage of time between the two events. This evidence is sufficient to raise a genuine issue of material fact as to whether Roberts and Sim were similarly situated employees.

As for Holmes, Shasta argues that he was not similarly situated to Roberts because the allegation against him was a single instance of inappropriate touching. But whether the allegation against Holmes is more or less serious than the allegations against Roberts (neither woman alleged he touched them) is not for this court to decide in the context of summary judgment. One can make a reasonable argument that sexual harassment is sexual harassment and a single instance of unwelcome touching should be investigated and handled no differently and disciplined no less severely than several instances of unwelcome comments.

With regard to the drug testing incident, Roberts alleges Heaton treated him more severely than he treated his fellow white employees. Specifically, he testified

that he witnessed white employees cause forklift accidents but not be required to undergo a drug test. Heaton testified that Shasta administers drug tests where there is cause to do so or following an accident. Shasta has not responded to Roberts's argument concerning its disparate application of its drug testing policy. Viewing the evidence in the light most favorable to Roberts, we conclude he has established a genuine issue of material fact on his claim of disparate treatment. The trial court erred in dismissing this claim on summary judgment.

Cannady's and Roberts's Retaliation Claims

Cannady and Roberts both appeal the summary judgment dismissal of their retaliation claims.[15] We conclude that there remain genuine issues of material fact on both claims and reverse their dismissal.

The WLAD prohibits employers from retaliating against employees who oppose discriminatory practices. RCW 49.60.210(1). The *McDonnell-Douglas* burden-shifting scheme applies to retaliation claims. *Milligan v. Thompson*, 110 Wn. App. 628, 638, 42 P.3d 418 (2002). To establish a prima facie case of retaliation, an employee must show that (1) he or she engaged in a statutorily protected activity, (2) the employer took an adverse employment action against the employee, and (3) there is a causal connection between the employee's activity and the employer's adverse action. *Cornwell v. Microsoft Corporation*, 192 Wn.2d 403, 411, 430 P.3d 229 (2018).

---

[15] Matewos also argues she had been subjected to retaliation, but did not include the claim in her complaint. She raised it for the first time in response to Shasta's motion for summary judgment. A plaintiff may only amend their complaint consistent with the provisions of CR 15. *See Pac. NW Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 352-53, 144 P.3d 276 (2006). Because Matewos did not appropriately amend her complaint to add a retaliation claim, Shasta did not have fair notice of this claim and the trial court did not address it on its merits. We will therefore not consider it on appeal.

- 30 -

To prove causation, an employee must show that retaliation was a substantial factor in motivating the adverse employment action. *Id.* at 412. Retaliation need not be the main reason for the employment action. *Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 746, 332 P.3d 1006 (2014). At the summary judgment stage, the employee is required to show only that "a reasonable jury could find that retaliation was a substantial factor." *Cornwell*, 192 Wn.2d at 412-13.

1. Cannady's Retaliation Claim

Cannady argues that Shasta terminated his employment in retaliation for complaining about the racist graffiti in the men's restroom. Shasta argues Cannady failed to establish the prima facie element of causation because the only evidence Cannady has to causally link his termination to his protected activity is the temporal proximity of the two events.

But an employee can satisfy their burden of showing a prima facie case of retaliation based on the employer's knowledge of the protected activity and the proximity in time between that activity and the termination. *See Cornwell*, 192 Wn.2d at 415-16 (holding that an employer's knowledge of an employee's protected activity, which is followed shortly in time by an adverse employment action, raises "a reasonable inference" that the adverse employment action was in relation to the protected activity and is thus sufficient evidence to survive summary judgment on the causation prong of a retaliation claim).

Shasta does not dispute that Heaton knew Cannady complained about the graffiti before he decided to fire him, but it argues that Holmes, the supervisor who

recommended that Shasta terminate Cannady, did not. Even if true, however, Holmes's lack of knowledge may prove immaterial to a jury. Although Holmes recommended that Shasta let Cannady go, it was Heaton who ultimately made the decision to terminate Cannady and it was Heaton to whom Cannady complained about the racist graffiti. Heaton's knowledge of the graffiti incident and his decision to terminate Cannady within days of Cannady's complaint is sufficient to establish a prima facie claim of retaliation.

Shasta did articulate a legitimate, nondiscriminatory reason for Cannady's termination. Under the *McDonnell-Douglas* burden-shifting scheme, the question is therefore whether Cannady presented sufficient evidence to prove at trial that Shasta's articulated reason is pretextual, or that retaliation was a substantial factor in his termination. *Scrivener*, 181 Wn.2d at 446. A plaintiff does not need to disprove the employer's articulated reason for discharge to satisfy the pretext burden of production. *Id*. To show pretext, a plaintiff may demonstrate that the articulated reason had no basis in fact, was not really the motivating factor for its decision, was not temporally connected to the adverse employment action, or was not a motivating factor in employment decisions for other employees in the same circumstances. *Id*. at 447-48. Alternatively, the employee may establish pretext by proving that retaliation was a substantially motivating factor in the discharge decision. *Id*.

As with his discriminatory discharge claim, Cannady has produced sufficient evidence to convince a reasonable jury that Shasta fired him for complaining about the pervasive racial harassment at the Tukwila plant. Immediately after Cannady

sought the removal of the racist graffiti, Shasta managers labeled him a complainer and recommended he be terminated. A jury could find the post hoc reasons Shasta has given for his termination to be inconsistent and unpersuasive. We thus conclude that Cannady has met his burden to sustain his retaliation claim.

2. Roberts's Retaliation Claim

Roberts contends that Shasta terminated his employment in retaliation for filing this lawsuit. Roberts argues there is a clear causal connection between his lawsuit, claiming racial harassment and discrimination, and Shasta's decision to terminate him. Shasta argues that the two complaints were factually-founded and a legitimate non-retaliatory reason for ending his employment.

But Roberts presented evidence that Shasta went looking for evidence to justify terminating him only after he filed this lawsuit. One complainant, Jessica McQuigg, reported that on the evening of December 19, 2018, Roberts approached her and asked "baby girl are you happy at home." Later, she went outside to her car to eat lunch and found Roberts standing near her car. He repeated the question he had posed earlier and stated that his wife did not know how good she had it. McQuigg left for lunch and when she returned, she said Roberts got into her car without her inviting him to do so. This incident made her feel uncomfortable about being around Roberts and she told a co-worker, Emily Aleki, about it.

McQuigg testified that Shasta manager Randy Elliot asked her to fill out a statement, she did not know why he did so, and she had no intention of filing a sexual harassment complaint against Roberts. She stated she did not feel like

Roberts was sexually harassing her when he got into her car while she sat inside. Rather, she stated, "I just felt uncomfortable." She testified she had no idea Shasta was investigating Roberts for sexual harassment, regretted making the statement, and never intended for Roberts to be fired.

Aleki was the second complainant. She testified that her conversation with McQuigg led her to report Roberts to Shasta manager, Chris Holmes. Aleki provided a written statement to Shasta, at Elliott's request, in which she stated she was a "victim of harassment" by Roberts. She reported that she and Roberts had developed a close friendship at the plant and she had asked to borrow money from him to pay bills. As their friendship deepened, however, she stated that Roberts began to give her compliments, like "you smell really good, I like it." One evening, she stated, Roberts came into a breakroom and asked her advice about his marriage, claiming he said that his wife "is doing me wrong." He later told Aleki, per her statement that while he loved his wife, "you and me have a connection." He is purported to have asked her if she was happy in her own marriage, asked her out to eat, and called her after work at home. She blocked him from contacting her by phone but then received a message from him via Snapchat. She also stated that Roberts "keeps telling me that he wants to take me out to dinner." She also reported that "[f]rom the start Daryll Roberts has been trying to get me to go with him to a lawyer or OSHA to try and shut this place [down] and I do not want any part of that. Just to clarify that Daryll Roberts never touched [me] but has been harassing me constantly on and off job site." Aleki, like McQuigg, testified that Elliot told her she had to file a statement that same day.

Roberts testified that right after filing this lawsuit, he heard rumors that Elliott was seeking out employees to provide statements about him. Roberts admitted he entered McQuigg's car to show her a photo of a motorcycle but stated that McQuigg cleared off the passenger seat for him. He stated that after speaking briefly, he got out of her car and denied asking her if she was happy at home or complaining about his wife. He also testified that he and Aleki were good friends and their families had socialized together. He stated he had lent her money with the consent of his wife and denied ever asking her out or making any comments of a sexual nature.

Maines testified that Elliott approached him about these two complaints and asked him to supply a statement. Maines refused to do so because he felt both complainant's stories "seemed a bit sketchy and I did not believe them." Maines had never seen Roberts treat a female employee inappropriately, had heard Roberts speak of his wife and family respectfully, and never had any reason to believe Roberts was a womanizer. Maines did participate in an investigation into these complaints by Shasta's human resources department, but protested that the interviewer's notes of their interview falsely stated that he knew Roberts had been intoxicated at work.

Viewing this evidence in the light most favorable to Roberts, a reasonable trier of fact could conclude that the complaints against Roberts were exaggerated or false, that Shasta sought these complaints as a way to justify discharging him, and that the actual reason for his termination was his complaints about the

discriminatory environment at the Tukwila plant. The trial court erred in dismissing Roberts's retaliation claim on summary judgment.

Negligent Supervision Claims

All three plaintiffs alleged claims for negligent supervision based on Shasta's failure to protect them from the intentionally tortious conduct of Chhin Sim. We conclude that the trial court erred in dismissing these claims as well.

A negligent supervision claim requires a showing that (1) an employee acted outside the scope of their employment; (2) the employee presented a risk of harm to other employees; (3) the employer knew, or should have known in the exercise of reasonable care, that the employee posed a risk to others; and (4) the employer's failure to supervise was the proximate cause of injuries to other employees. *Niece v. Elmview Grp. Home,* 131 Wn.2d 39, 48-49, 51, 929 P.2d 420 (1997). A claim of negligent supervision must be based on tortious or wrongful conduct. *Haubry*, 106 Wn. App. at 679.

Shasta argues that the trial court properly dismissed this claim because the plaintiffs cannot base a negligent supervision claim on the same tortious conduct that forms the basis of their WLAD claims. Shasta relies on *Francom* in which this court affirmed the dismissal of the plaintiff's negligent supervision claim as duplicative of their discrimination claim. 98 Wn. App. at 865-66. But this reading of *Francom* does not withstand a close reading.

In that case, the employer contended that the plaintiff could not bring a negligent supervision claim against an employer based on an injury inflicted by a

fellow employee because such a claim was barred by the Industrial Insurance Act (IIA). 98 Wn. App. at 865-66. The court rejected that argument and held that the IIA did not bar the negligent supervision claim. *Id.* at 866.

The *Francom* court, however, affirmed the dismissal of the plaintiff's intentional infliction of emotional distress and negligent supervision claims because they were based on the same facts as the underlying WLAD claim, and "the law will not permit a double recovery [and] a plaintiff will not be permitted to be compensated twice for the same emotional injuries." *Id.* at 864 (citing *Johnson v. Dep't of Social and Health Servs.*, 80 Wn. App. 212, 230-31, 907 P.2d 1223 (1996)). But this court, in *Elliott v. Washington Department of Corrections*, no. 74137-3-I, slip op. at 17 (Wash. Ct. App. Feb. 29, 2016) (unpublished),[16] rejected an employer's reliance on *Francom* to bar a negligent supervision claim when that claim was asserted in the alternative. Our local federal district courts have similarly questioned whether *Francom*'s concern about the mere potential for double recovery warrants the dismissal of an otherwise adequately pled claim:

> [T]his issue relates to an award of damages, not the submission of an alternative legal theory to the factfinder. . . . Until such time as Plaintiff is granted judgment on the WLAD claims, Defendants' concerns regarding a double recovery are premature.

*Neravetla v. Virginia Mason Med. Ctr.*, No. C13-1501-JCC, 2014 WL 12787979 at *5 (W.D. Wash. 2014) (unpublished) (citations omitted). *See also Ngo v. Senior Operations, LLC*, No. C-20-0835RSL, 2020 WL 2614737, at *7 (W.D. Wash. 2020) (unpublished) (declining to dismiss emotional distress claim simply because it raises specter of double recovery; parties allowed to assert claims in the

---

[16] https://www.courts.wa.gov/opinions/pdf/741373.pdf

alternative); *Hennessey v. ICE Floe, Inc.*, No. C-20-0835RSL, 2021 WL 322685 at *1 (W.D. Wash. 2021) (unpublished) (plaintiff allowed to amend complaint to add claim of negligent supervision even though duplicative of discrimination claim).

The plaintiffs in this case contend that their negligent supervision claims are permissible alternate theories of recovery and that any concern about double recovery can be addressed with jury instructions at trial. We agree. The trial court erred in dismissing the negligent supervision claims as duplicative.

Shasta separately contends on appeal that the plaintiffs failed to produce evidence that Shasta knew of specific dangerous tendencies of a specific employee who proximately caused tortious injury. Shasta contends there is no evidence to establish that Sim authored the graffiti in the men's bathroom in March 2017. But there is circumstantial evidence that he used racial epithets and made statements almost verbatim to what was written on the bathroom walls. Matewos testified that Sim told her that "he hated black people," and that "we need to get the monkeys out of the building" and "make Shasta white again." A reasonable jury could conclude that Sim did in fact author the graffiti.

Shasta next contends that the plaintiffs failed to show that anyone reported that Sim was engaging in tortious conduct. But Shasta warned Sim in 2012 not to harass and send threatening text messages to employees. And Maines testified he reported Sim's threatening statements and conduct to Heaton. When Shasta terminated Sim, its notice stated that "[y]ou have been disciplined in the past for workplace harassment." In preparing the termination notice, at least one manager did not want to sign it because he did not want to "have his name on something

because this guy is a [loose] [cannon]." After Sim was discharged, Maines saw that someone had allowed him back onto company property and complained to human resources about how intimidating his presence would be to Matewos. Employee Daniela Moreno told Terri Bowen that people were frightened of Sim because he had threatened so many coworkers with physical violence in the past. Moreno was unwilling to testify for Shasta in Sim's arbitration proceeding in which he challenged his discharge because she "was getting calls at all hours of the day and night from [Sim] for a number of weeks after [she] left." This evidence of Sim's volatility, threatening conduct, and verbal and physical harassment of his coworkers is sufficient to present a question of fact as to whether Shasta knew, or should have known in the exercise of reasonable care, that Sim posed a risk to its employees. The trial court erred in dismissing the negligent supervision claims on summary judgment.[17]

Reversed and remanded.

Andrus, C.J.

WE CONCUR:

Birk, J.

Bowman, J.

---

[17] The trial court dismissed the loss of consortium claims of the plaintiffs' spouses based on the dismissal of the underlying claims. Because we reverse the dismissal of the plaintiffs' claims, we also reverse the dismissal of the loss of consortium claims.

- 39 -